Argued October 19; affirmed November 16, 1948; petition for rehearing argued April 14; reversed June 7, 1949

# DUNNING v. NORTHWESTERN ELECTRIC CO.

199 P. (2d) 648

206 P. (2d) 1177

380

*John R. Becker,* of Portland, argued the cause for appellant. With him on the brief were Laing, Gray & Smith and Henry S. Gray of Portland.

*Frank C. Hanley,* of Portland, argued the cause and filed a brief for respondent.

Before ROSSMAN, Chief Justice, and LUSK, KELLY and HAY, Justices.

KELLY, J.

This is an action for damages to recover for personal injuries sustained by plaintiff between 1:00 and

1:30 A. M. on December 21, 1945, while driving a Dodge pickup automobile in an easterly direction on Mill Plain Road, a public highway, at a point thereon just east of the city limits of Vancouver, Clark County, Washington.

Plaintiff claims that defendant negligently permitted a certain power pole on its power line on the south side of said highway to remain in use after it had become rotten, old, worn and defective; that said pole had fallen across and obstructed said highway at said point; that plaintiff's automobile collided therewith and as a result of said collision plaintiff sustained a permanent injury in that the cervical vertebrae of his spinal column were compressed and fractured. From a judgment in favor of plaintiff, in the sum of $20,000, defendant appeals.

Plaintiff's version of the facts is materially different from that of defendant's witness who said that he saw the collision. The time and place of the accident are not in issue. The controlling issue arises with respect to the course taken by plaintiff when the collision occurred.

Plaintiff testified that at about one o'clock in the morning of December 21, 1945, during darkness, while it was misty, the wind was blowing a little and there was very little fog, he was going east on his right or southerly side of Mill Plain Road driving his 1943 Dodge pickup automobile at a rate of speed at about 15 miles per hour and, after he was over the top of Harney Hill, he saw something about 10 feet away from him that looked like a pole lying across the road diagonally in a northwesterly direction; that he turned to the right or southerly to go around it and miss it and, as he couldn't get around it, he then turned his car to the

left or northerly direction whereupon the car hit the pole at an angle, the two front springs and bumper hit the pole, jumped, and his automobile up-ended toward the right or southerly side of the road, made a flop, a kind of somersault and lit on top of the cab. Plaintiff was thereby injured as he claimed in his complaint. He then got out of the car assisted by a man, who at the time inquired if any one else was in the car. Shortly after taking note of the pole lying across the road broken in three pieces and the condition of the butt end of the pole, plaintiff went home.

Defendant's version was given by witness Sullivan and is to the effect that, before plaintiff reached the place of the collision and while the pole in suit was still standing, plaintiff either drove his car southerly off of the paved portion of the highway and caused it to collide with the metal guard protecting the guy wire that extended westerly from the top of the pole in suit to the ground, or plaintiff caused his car to strike the pole itself, thereby bringing upon himself and his car the resultant damage.

The metal guard that was attached as a protecting device to the guy wire was not introduced in evidence; but there is testimony in the record that it was bent until it had the appearance of the letter "V" and was deemed by the repair men to be worthless.

Plaintiff denied that the pole was standing when his car hit it. He also denied that his car struck the metal guard protecting the guy wire attached to the pole in suit. Two officers, who examined plaintiff's car at the garage, where it had been impounded, testified that there were no marks upon its front bumper or front axle as if a contact had been made by striking some metal appliance as the metal guy guard. These

officers also testified that the radiator was not crushed in.

■ As to the manner in which the accident occurred, the trial jury evidently accepted plaintiff's version; and, as there is substantial testimony supporting the jury's finding, this court cannot hold otherwise.

In conformity with the view that plaintiff's version of the occurrence is true, the doctrine of *res ipsa loquitur* applies. This is a rule of evidence. See *Cunningham v. Oregon Farmers' Institute,* 168 Or. 452, 124 P. 2d 304, and cases there cited. Under this principle, where that which causes an injury is under the management and control of the defendant and the accident is such as in the ordinary course of things does not happen, if those who have the management and control use proper care, it affords reasonable evidence, in the absence of explanation, that the accident is the result of want of care. In plain English the thing itself speaks.

Stating it conversely, if the only explanation of defendant is disproven, the result is to impute want of care or negligence to defendant. The application of this maxim does not shift the burden of proof from plaintiff to defendant; it merely places the duty upon defendant in the first instance to offer testimony tending to overcome the presumption or inference that otherwise the jury would be permitted to apply. The burden of proving the alleged negligence of defendant by a preponderance of the evidence remains throughout the trial upon plaintiff as the party holding the affirmative of such issue. *Phillipsen v. Hunt,* 129 Or. 242, 247, 276 P. 255; *Francisco v. Circle Tours Sightseeing Co.,* 125 Or. 80, 265 P. 801; *Coblentz v. Jaloff,* 115 Or. 656, 239 P. 825.

The record discloses that the pole in suit was installed 14 years before this accident occurred. There

is no evidence disclosing that any inspection of the pole was made by defendant at any time thereafter. *Nichols v. City of Minneapolis and Erie Tel. & T. Co.*, 33 Minn. 430, 23 N. W. 868; *Shawnee Light & Power Co. v. Sears*, 21 Okl. 13, 95 P. 449, 455, 456; *Mayes v. Kansas City Power & Light Co.*, 121 Kan. 648, 249 P. 599, 600; *Juchert v. California Water Service Co.*, 16 Cal. 2d 500, 106 P. 2d 886, 894.

As to the question presented by defendant's assignment of error No. 5, whether the award of $20,000 to plaintiff by the jury is excessive, we must first determine what the jury evidently determined to be the actual injury sustained by plaintiff. In other words, whether the jury could have found from the testimony that plaintiff was permanently injured in that he sustained a fracture of his cervical vertebrae.

Dr. Alan Welch Smith, a witness in behalf of plaintiff, testified that he had been practicing his profession as a physician and surgeon for about 52 years specializing in general surgery.

In examining the X-ray plate, plaintiff's exhibit No. 7, the same being an X-ray of plaintiff's cervical spine, Dr. Smith testified as follows:

"A You see here, is the base of his skull and here is the trouble in here, between the atlas and axis.
Q What trouble does that show?
A That trouble is where his neck is broken."

Referring to another X-ray plate, known to this record as plaintiff's exhibit No. 11, Dr. Smith testified as follows:

"Q What does that show?
A Well, that is the best one I have seen yet. Now, you see here is this odontoid process here,

that little tip-like looking bony connection between the atlas and the axis, and here on the side (indicating) it shows the disturbance which it has created, and that has injured his spinal cord and caused that paralysis."

Continuing, Dr. Smith testified as follows:

"Q Now Doctor, what would you say as to whether or not the injuries you have described are of a permanent nature or temporary, in your opinion?
A In my opinion this man is absolutely all through.

Q What does that mean?
A Permanent total.

Q Permanently and totally disabled?
A Yes, sir.

Q Do you think he will ever be able to perform any work?
A No, sir."

■ As an appellate court, we cannot say that the jury was unwarranted in finding that plaintiff suffered an injury resulting in permanent total disability.

It was stipulated that a man 45 years of age has a life expectancy of 24.54 years.

In view of the testimony above quoted, the stipulation as to life expectancy and the undisputed fact shown by plaintiff's testimony, that at the time of the accident in suit plaintiff was 45 years of age, and the further statement by plaintiff that before he was injured, he had an earning capacity of $275 per month, we cannot say that the award of the jury was excessive.

The following are citations to thirteen of the many cases wherein the courts have held that similar awards were not excessive: *Olden v. Babicora Development Co.*, 107 Cal. App. 399, 290 P. 1062, 1072; *Perry v. D. J.*

& T. Sullivan, Inc., 219 Cal. 384, 26 P. 2d 485; *Hansen v. Standard Oil Co.*, 55 Idaho 483, 44 P. 2d 709; *Powell v. Standard Oil Co.*, 168 Minn. 248, 210 N. W. 55; *Rose v. Missouri Dist. Tel. Co.*, 328 Mo. 1009, 43 S. W. 2d 562, 81 A. L. R. 400; *Lund v. Olson*, 182 Minn. 204, 234 N. W. 310, 75 A. L. R. 371; *Postal Telegraph Cable Co. v. White*, 190 Ark. 365, 80 S. W. 2d 633; *Masonite Corp. v. Lochridge*, 163 Miss. 364, 140 So. 223, 141 So. 758; *Stein v. Rainey*, 315 Mo. 535, 286 S. W. 53; *Frese v. Wells*, (Mo. Sup. Ct.) 40 S. W. 2d 652; *Hoelzel v. Chi. R. I. & P. Ry. Co.*, 337 Mo. 61, 85 S. W. 2d 126; *Paul v. Atlantic Refinery Co.*, 304 Pa. 360, 156 A. 94; *Key v. Carolina & N. W. Ry. Co.*, 165 S. C. 43, 162 S. E. 582; Appeal dismissed, 284 U. S. 691, 52 Sup. Ct. 139.

Defendant's first assignment of error is to the effect that the court erred in denying defendant's motion for a directed verdict; and, after verdict, in denying defendant's motion for a judgment in its favor notwithstanding said verdict. Based upon what we have said, we hold that the trial court did not err in denying said motions.

In the case of *Pennsylvania R. Co. v. Chamberlain*, 288 U. S. 333, 53 Sup. Ct. 391, 77 L. Ed. 819, 824, cited by defendant, the administratrix of Charles Frederick Chamberlain, deceased, instituted the action against the railroad company alleging that his death was caused by a collision of a string or cut of nine cars going down an incline behind a cut of two cars upon which deceased was riding. One witness testified that he heard a crash and at a distance saw what appeared to be a conjunction with the nine cars in the rear with the two cars upon which deceased had been riding. Three witnesses, however, who were riding the nine-car string, testified positively that no such collision occurred.

Manifestly, the inference of this one witness was deemed insufficient to constitute substantial testimony, it being drawn from the fact that at a distance the witness had heard a crash, and his inference was that such crash was caused by the impact of the nine-car string upon the two-car string.

*Horn v. National Hospital Association*, 169 Or. 654, 131 P. 2d 455, is a case wherein plaintiff instituted an action against the hospital association for alleged malpractice by one of its surgeons.

Defendant's surgeon diagnosed plaintiff's case as appendicitis and an operation was performed. Plaintiff at the time was also suffering from calcified gall bladder and gall stones.

The doctrine of *Horn v. National Hospital Association*, supra, is that where there are two or more possible causes of injury for one or more of which defendant is not responsible, plaintiff in order to recover, must show evidence that the injury was wholly or partly the result of that cause which would render defendant liable. Diagnosing plaintiff's case to be one of appendicitis and operating therefor was not the cause of plaintiff's gall bladder ailments.

In the case at bar, the plaintiff was injured either by colliding with the pole or its guy wire protection, or by colliding with the pole after it had fallen across the highway. The jury believed plaintiff's story to the effect that he collided with defendant's fallen pole across the highway.

*Kukacka v. Rock*, 154 Or. 542, 61 P. 2d 297, discloses that defendant Rock had driven a car with one Dr. Adams as one of his guests. Rock's car overturned. Dr. Adams attempted to signal plaintiff's car to stop; but, instead of stopping, plaintiff disregarded the signal

and ran into Rock's car and was hurt. The court held that Rock was not liable, applying the principle that where the only reasonable deduction from the evidence in negligence cases is that the injuries sustained were not the natural and probable consequences of the alleged negligence, the question of proximate cause becomes a matter of law for the court.

In the case at bar, the alleged negligence of defendant consisted in failing to sustain and maintain the support and strength of its pole.

Whether this was the proximate cause of plaintiff's injury depended upon whether the pole was lying across the traveled part of the public highway in such a way that when plaintiff attempted to negotiate such highway, he sustained such injury; or, instead of such a state of facts, plaintiff actually drove his car against either the guy guard or the pole itself in such a way as to be injured and, incidentally, to cause the pole to fall. There was direct testimony given by plaintiff that the fallen pole obstructed the highway and caused his injury. There was a letter referring to the accident written by defendant's attorney to plaintiff in which reference is made to December 21st "when you ran into a fallen pole in Clark County, Washington". Enclosed with this letter was a memorandum or remittance advice that identified a check also enclosed, upon which memorandum reference is made to an injury sustained by plaintiff when he "ran into a fallen pole at the top of Harney Hill (12-21-45) on Mill Plain Road, Clark County, Washington".

That feature of the case does not depend on inference.

We cannot agree with defendant that plaintiff's version is so unreasonable that it should be disregarded

as contrary to all experience, reason and truth. The jury must have believed it and we are not warranted in overruling the judgment of the jury thereupon.

We are impelled to say that the jury adjudged and determined what the facts were "by the usual and ordinary intellectual processes; that is, by applying the thinking faculties of their minds." In so doing, the duty enjoined by Campbell, J. in *Jerke v. Delmont State Bank,* 54 S. D. 446, 223 N. W. 585, 72 A. L. R. 7, and quoted in Wigmore on Evidence (3 Ed.) Sec. 2495 was duly performed.

*Morser v. Southern Pacific Co.,* 124 Or. 384, 262 P. 252, is a case where plaintiff was struck by an electric train while he was crossing its track. We quote from the opinion:

> * * * "Plaintiff says that when he was about seven feet from the track he looked and listened for a train, but neither saw nor heard one. Is this testimony not utterly preposterous and unreasonable? Would any reasonable person believe that a man in full possession of his faculties could look and listen under such circumstances and not be aware of an approaching train? The physical facts absolutely and conclusively refute the bare statement of plaintiff that he neither saw nor heard the train, assuming that he looked and listened."

The difference between the sound, sight and situs of a moving locomotive and train of cars upon a railroad track when sought to be seen and heard by a man listening and looking while standing within seven feet of the track, and the silent quietude of a broken and partly decayed pole lying prostrate athwart a public highway over which an autoist is traveling at the rate of 15 miles per hour, is impressively obvious and def-

initely distinguishes the Morser case from the case at bar.

Defendant, in the opening brief, quotes as follows from *Powder Valley State Bank v. Hudelson,* 74 Or. 191, 144 P. 494, to-wit:

> * * * "By 'evidence to support the verdict' is meant some legal evidence tending to prove every material fact in issue as to which the party in whose favor the verdict was rendered had the burden of proof."

We venture to supplement that statement by quoting from the same opinion:

> * * * "As stated supra, we have no authority to determine in whose favor the evidence preponderated. We are limited in determining whether there was any evidence to support the finding of the jury. We find that there was some legal evidence to support the verdict, and that the motion for an instructed verdict was properly denied." *Powder Valley State Bank v. Hudelson,* supra, p. 199.

*Vale v. State Industrial Accident Commission,* 160 Or. 569, 576, 86 P. 2d 956, is also cited by defendant.

In that case, claimant's husband was an employee of Anliker Brothers, a partnership engaged in logging operations. The husband died on January 15, 1937. The cause of his death was diagnosed as lobar pneumonia. The court held that there was no substantial evidence that deceased became contaminated while employed by Anliker Brothers.

■ We cannot say that plaintiff's version of the facts in the case at bar does not constitute substantial evidence. The jury in the trial court, who saw and heard plaintiff, as well as the other witnesses testify, have found by their verdict in plaintiff's favor; it is not the

province of this court to substitute its judgment for that of the jury upon questions of fact.

*Aune v. Oregon Trunk Ry.,* 151 Or. 622, 51 P. 2d 663, is a case where plaintiff's warehouse alongside defendant's railway tract was burned by a fire started by hobos in defendant's freight cars. The complaint was construed by the court to the effect that the hobos were not invitees of defendant. We quote from the opinion:

> \* \* \* "This case, therefore, comes within the general rule that where, between defendant's act and the injury, there has intervened an independent illegal act of a third person without which the injury would not have happened, the latter will be held to be the proximate cause of the loss and the defendant will be excused: Watson on Damages, Sec. 12."

In the case at bar, it is not contended that there was an intervening, independent, illegal act that caused plaintiff's injury. The only claim made in that regard by defendant is that plaintiff drove his car either against an upright pole or upon its metal protected guy wire and thereby injured himself.

Defendant also cites the case of *Masonite Corporation v. Hill,* 170 Miss. 158, 154 So. 295, 95 A. L. R. 157. The holding of that case is that an inference upon an inference will not be permitted to prevail when the fact sought to be established by such an inference upon an inference is capable of more satisfactory proof by direct, positive or demonstrative evidence within the reasonable power of the party holding the burden to produce. There, a swimmer sought damages, because of an infection in his limbs, on the ground that defendant's effluent from its masonite factory had contaminated the water of Laurel Creek, and when plaintiff

bathed therein at a point 45 miles south of the intake from defendant's factory he became poisoned thereby. The Mississippi court pointed out that the determination whether the water at the point designated had been contaminated, and, if so, the nature of such contaminating agency could at nominal expense have been obtained by means of a chemical analysis of such water. In that case, the doctrine of *res ipsa loquitur* had no application, because defendant did not have sole and exclusive control and management of the 45 miles of running water of Laurel Creek intervening between the masonite factory and the place of plaintiff's alleged contamination.

Defendant's assignment of error No. 2 is as follows:

"The court erred in admitting in evidence, over the objection of defendant's counsel, a letter and enclosures (Exhibit 16) directed to plaintiff by counsel for defendant in connection with an attempted compromise of plaintiff's claim, insofar as the references therein to 'a fallen pole' were permitted to go to the jury as a declaration of the defendant against interest."

Hereinabove, we have referred to this letter and its enclosures.

The letter in question reads as follows:

"August 6, 1946.

Mr. M. C. Dunning,
Vancouver
Washington.
Dear Sir: I hand you herewith Northwestern Electric Company's check No. 5210 in your favor for $250.00 as a payment on account of the injuries sustained by you on December 21, 1945, when you ran into a fallen pole in Clark County, Washington.

I have had the form of notation attached to the check changed so that it shows that the check is not made as a final payment or final settlement. The treasurer of Northwestern Electric Company informs me that it is impossible to change the notation on the face of the check which reads as follows: 'In full settlement of account as noted above. If not correct, return the statement of difference', as the bank would consider the check mutilated if this statement was crossed out and would not cash the check. However, as one of the attorneys for the company, I am authorized to assure you that you may safely cash the check and the company will never contend that it is made as final payment, for it is not so intended.

Very truly yours,

Henry S. Gray.''

The enclosures in the letter consisted of a canceled check bearing No. 5210, dated July 3, 1946, for $250.00, and a paper bearing the title ''Northwestern Electric Company Remittance Advice''. The paper contains the following statement:

''Payment on account of injury sustained December 21, 1945, when Dunning ran into a fallen pole at the top of Harney Hill, Mill Plain Road, Clark County, Washington. This check is not in final settlement of this claim.''

It will be noted that there is no reference in the foregoing letter to an offer of compromise; but treating it as one step in a contemplated compromise, we think that our statute renders the statement therein with respect to ''a fallen pole'' admissible.

The applicable provision of the statute is as follows:

''An offer of compromise is not an admission that anything is due; but admissions of particular facts, made in negotiation for compromise, may be

proved, unless otherwise specially agreed at the time." Section 10-302, O. C. L. A., Vol. 2 p. 166.

We think no error was committed in receiving the above letter in evidence. In passing it may be noted that a letter from Mr. D. P. Lamb, Claim Agent, of defendant bearing date of January 2, 1946, to plaintiff was received in evidence and marked plaintiff's Exhibit 14. Therein the damage to plaintiff's car was referred to as having occurred "when you struck the pole lying in the highway at Harney Hill".

Defendant's third assignment of error is based upon the failure of the trial court to withdraw from the consideration of the jury the following specification of negligence appearing in subdivision (b) of paragraph V of plaintiff's complaint, viz:

"Defendant carelessly and negligently failed and neglected to properly brace and maintain said pole with guy wires in order to hold the same erect and keep the same from falling over and upon and across said highway and thereby obstructing the same."

No error was committed by the trial court in submitting the above specification of negligence to the jury. It is a certainty that the pole in suit was not held erect or kept from falling over and across the highway. The jury was justified in finding that plaintiff did not cause it to fall. If it had been sufficiently braced and maintained, it would not have fallen.

Defendant's fourth assignment of error is based upon the trial court's failure to give the following instruction requested by defendant:

"Under the law of Washington, it is unlawful to operate or drive any vehicle over or along any pavement or gravel or crushed rock surface on a public highway with one or more wheels off the

roadway thereof, except for the purpose of stopping off such roadway, or returning thereto after having so stopped, and, if you find from the evidence that the plaintiff was driving with one or more wheels of his vehicle off the pavement at the time the accident occurred, with no intention of stopping off the roadway, he was violating the highway code of Washington and was guilty of negligence per se. If you find that the plaintiff was negligent in that regard, and that such negligence was the proximate cause of his injury, the plaintiff cannot recover in this action.''

Defendant's specifications of negligence attributed to plaintiff in defendant's answer do not include the charge that plaintiff operated or drove his car along any pavement or gravel or crushed rock surface on a public highway with one or more wheels off the roadway thereof. Neither does plaintiff's case in chief show that he drove his car in that way.

Moreover, the learned judge of the trial court in his charge to the jury included the following instructions:

"Under the law of Washington, every person operating or driving a vehicle of any character upon the public highways of that state is required to operate the same in a careful and prudent manner and at a rate of speed no greater than is reasonable and proper under the conditions existing at the point of operation, taking into account the amount and character of the traffic, weight of vehicle, grade and width of highway, condition of surface and freedom of obstruction to view ahead, and consistent with any and all conditions existing at the point of operation, so as not unduly or unreasonably to endanger the life, limb, property or other rights of any person entitled to the use of such public highways. Violation of this law would constitute negligence in and of itself.''

"The defendant company had the legal right to maintain its poles, wires, guys and anchors at the points and in the positions in which the same were located immediately prior to the falling of the pole involved in the accident as shown by the evidence. A public utility is under no obligation to maintain its facilities so as to withstand the impact of motor vehicles which depart from the paved surface of adjacent roadways. And if you find from the evidence that plaintiff permitted his vehicle to leave the paved surface of the roadway and collide with defendant's pole or guys, causing them to fall down, the plaintiff cannot recover in this action for any injury sustained by him as a result of such collision."

■ In the light of the foregoing instructions, defendant's fourth assignment of error is untenable.

Defendant's assignment of error No. 6 is as follows:

"The verdict was against law, as expounded to the jury through the instructions of the Court."

The reason prompting us to hold that no error was committed by the trial court in denying defendant's motions for a directed verdict and after verdict for judgment notwithstanding the verdict, impels us to hold also that assignment of error number six is untenable.

The judgment of the circuit court is affirmed.

HAY, J., concurs.

ROSSMAN, C. J., specially concurs in an opinion.

LUSK, J., concurs in the result.

———————

ROSSMAN, C. J., specially concurring.

I concur in all of the foregoing with the exception of the two paragraphs which state and employ the

doctrine of.*res ipsa loquitur*. I dissent from those paragraphs. The pole, which the plaintiff claims fell and injured him, stood in a public thoroughfare. The defendant, clearly, did not have the exclusive management and control of it. The facts concerning its condition were as available to the plaintiff as to the defendant.

## ON PETITION FOR REHEARING

*John R. Becker,* of Portland, argued the cause for appellant. With him on the brief were Henry S. Gray and Laing, Gray & Smith, of Portland.

*Frank C. Hanley,* of Portland, argued the cause and filed a brief for respondent.

Before LUSK, Chief Justice, and BRAND, BELT, ROSSMAN and BAILEY, Justices.

REVERSED.

ROSSMAN, J.

The petition for a rehearing contends:

1. "The majority opinion was in error in holding that the doctrine of res ipsa loquitur applies in this case."
2. "The Court erred in holding that there is substantial testimony supporting the jury's findings as to the manner in which plaintiff's accident occurred."
3. "The Court erred in holding that the trial court did not err in denying defendant's motion for a directed verdict; and, after verdict, in denying defendant's motion for a judgment in its favor, notwithstanding said verdict."

According to the complaint, the respondent (plaintiff), while driving his automobile "on the 21st day of December, 1945, shortly after midnight" in an easterly

direction along Mill Plain road a short distance east
of Vancouver, Washington, encountered a power pole
belonging to the appellant (defendant) which "had
fallen from defendant's said power line across and

obstructed said highway." The complaint described
the pole as "rotten, worn, old and defective." When the
respondent's car struck the pole, he received, so the
complaint says, the injuries which underlie this action.

The specifications of negligence which the complaint sets up follow:

1. "Defendant carelessly and negligently maintained the aforesaid power pole alongside of said highway in a decayed, rotten, worn and defective condition so that the same was likely to and did fall across, shatter upon and obstruct said highway, which fact was known to the defendant or could have been known by the exercise of reasonable care."

2. "Defendant carelessly and negligently failed and neglected to properly brace and maintain said pole with guy wires in order to hold the same erect and keep the same from falling over and upon and across said highway and thereby obstructing the same."

3. "Defendant carelessly and negligently failed and neglected to replace said pole with a sound and sufficient pole prior to the time same fell over and upon said highway."

4. "Defndant carelessly and negligently failed to warn plaintiff Merton C. Dunning and other travelers on said highway before reaching said old, worn, defective and rotton pole that the same was likely to fall over, upon, across and obstruct said highway."

Upon motion of the appellant, and with the approval of the respondent, the fourth specification of negligence was withdrawn from the jury's consideration. The other three were submitted to that body. Hereafter, when we employ the term "specifications of negligence", we shall mean the three which were submitted to the jury. The pole to which the complaint refers was identified by the witnesses as pole No. 2667. There is no claim that the pole mentioned in the complaint is not the one identified by that number. Upon the sketch which accompanies this opinion, we marked the place where it stood.

As a witness, the respondent swore that his accident occurred "about one o'clock, between twelve-thirty and one o'clock in the morning." The time when it took place is an item of importance. The roadway shown in our sketch is the one along which the respondent was driving. His car was a small pick-up truck and he was moving in an easterly direction at a speed of fifteen miles an hour. According to him, his lights were in good condition and illuminated the road. He testified that when he reached a point "around ten feet or such a matter" of the place occupied by pole 2667, he saw an object lying upon the pavement and presently perceived that it was a pole. According to him, his car struck the pole, "up-ended" and came to rest upon the top of its cab. After he had climbed out of his overturned truck he noticed, so he swore, that pole 2667 was in three pieces and that they were upon the roadway. He testified that the three pieces were of approximately equal length, that the part he had struck was the middle section, and that it lay across the south half of the pavement. The lower third lay close to the jagged stump of the broken pole. The respondent's witnesses did not state with clarity the place where the upper third lay, but the brief of the respondent says that it was upon the north half of the pavement. We carefully read the evidence upon which the brief depends, but construe it to mean that the upper third lay at the north edge of the ditch which paralled the south shoulder. We will, however, accept the version set forth in the respondent's brief and deem that the upper third was upon the north half of the pavement.

Apart from presenting evidence that (a) at the time of the mishap "a light breeze" was blowing, and (b) the part of pole 2667 at the surface of the ground was

partially decayed, the respondent did not account for the presence of the pole upon the roadway. He swore that he did not see it fall, and likewise swore that his car did not knock it down. The appellant submitted evidence which, it contends, shows that the respondent's truck knocked pole 2667 to the ground by climbing partially up the guy wire which was west of and partially supported the pole.

It is seen from the foregoing that pole 2667 is the pivot of this case. By reverting to the specifications of negligence, it will be noticed that they are concerned exclusively with that pole. No other part of the appellant's system and no phase of its operations are attacked by the respondent. All of the charges of negligence concern pole 2667, and by glancing over them once more it is seen that they aver that the pole was (1) decayed, (2) inadequately braced, and (3) should have been replaced with a new pole. There is no contention that pole 2667 was improperly placed. It stood upon the berm of the highway six and one-half feet south of the pavement.

The appellant concedes that pole 2667 displayed some decay, but submits that when a pole is put in the ground an oversize one is selected so that it will not be necessary to replace it when decay begins. The appellant presented evidence which, it claims, shows that pole 2667 was secure in the ground and that, in addition, it was braced.

The appellant is not liable to the respondent for the injuries which he sustained unless one or more of the foregoing charges of negligence is supported by substantial evidence, and not even then unless the negligent act was the proximate cause of the injury which is described in the complaint. The appellant

owed a duty to the respondent and other travelers upon the highway to maintain its poles in a reasonably safe condition: VIII Thompson, Com. on Neg., § 1241; Elliott, Roads and Streets, 4th Ed., § 1071; and 18 Am. Jur., Electricity, p. 484, § 92.

Pole 2667 was a Western red cedar pole 40 feet long, 5½ feet of which were in the ground. Thus 34½ feet of the pole were above the ground. According to the respondent's witnesses, the diameter of the pole at its base was about 12 to 14 inches. No witness claimed that pole 2667 did not stand perpendicular and, hence, we shall assume that its position was at right angles to the ground. By reverting to our sketch, it will be observed that a guy cable which was attached to pole 2667 ran north to a stub pole; that two copper wires extended from pole 2667 to pole 2668; that two more copper wires extended from pole 2667 to pole 443; and that on the west a guy cable ran from pole 2667 to a guy anchor 17½ feet west of the pole. In other words, pole 2667 did not stand alone. To keep from falling over it was not dependent upon its butt of 5½ feet which was in the ground; it was secured at all four points of the compass. The stub pole across the road from pole 2667 was 18 feet tall and about 14 inches in diameter. It was decayed to the same extent as pole 2667. The two guy cables were attached to pole 2667 about 18 inches from its top.

When the respondent climbed out of his overturned vehicle, he noticed not only that pole 2667 was upon the ground, but also that the stub pole was down. It had broken off close to its base and its position upon the ground was roughly east and west. It was not upon the pavement.

We now turn to testimony given by Mr. Alfred O.

Mangold, a division engineer in the appellant's employ. His testimony was not contradicted and its verity is unchallenged. According to that witness, the guy cable which ran north of pole 2667 to the stub pole and the other which ran west to the guy anchor were "high tensile strength steel guy strand" having a breaking stress of 14,500 pounds. The two copper wires which ran from pole 443 to pole 2667 and from the latter to pole 2668 were No. 6 "hard-drawn copper conductors." Each of those wires had a tensile strength of 1,280 pounds and, therefore, the combined strength of the two wires which ran from pole 443 to pole 2667 had a combined tensile strength of 2,560 pounds. The two which ran from pole 2667 to pole 2668 had similar strength. The primary purpose of a conductor wire is to transmit electricity, but such a wire also serves as a guy. A pole of the size of 2667 weighs 900 to 1,000 pounds and its weight above the ground is about 850 pounds. A single No. 6 conductor of the type we have been mentioning is readily capable of supporting such a pole. Near the top of pole 2667 were four cross-arms having a total weight of 300 pounds. The cross-arms, the conductors and the guy cables attached to pole 2667 brought the latter's entire weight up to about 1,650 pounds. All of that testimony was given by Mr. Mangold. One of the respondent's witnesses, a deputy sheriff of Clark County, who came to the scene of the misadventure a few minutes after its occurrence, described the copper wire as "a pretty good-sized wire; it will stand a lot of pressure."

■ As we said, pole 2667 was affected with decay at the ground level. The proof shows that the part of the pole which was in the ground was solid. Evidence given by the respondent's witnesses, although in some

respects equivocal, indicates quite clearly that the part above the ground was also free from rot. None of the witnesses who examined the three broken parts mentioned the presence of any decay at their ends or at any place except at the ground level of the lowest part; in fact, one of the respondent's witnesses testified: "The balance of the pole was solid, above the ground." How far the decay penetrated the pole at the ground level is a detail upon which the witnesses did not agree. Under those conditions, we deem it our duty, in disposing of the contentions before us, to give effect to the evidence which is most favorable to the respondent. The witness most favorable to him said that there remained in pole 2667 only "five or six inches, not over six inches" of solid wood. Mr. Mangold, in testimony which is unchallenged, swore that a red cedar pole has a compressive strength of 5,600 pounds for each square inch. If the diameter of the solid wood was only five inches, the compressive strength of the pole was more than seventy times the weight it bore.

The respondent presented no evidence at variance with Mr. Mangold's; in fact, he left untouched the aspects of the facts concerning which Mr. Mangold testified. From the foregoing, we see that pole 2667 had ample solid wood to sustain safely the weight it bore, that its butt of 5½ feet was free from decay, that cables of great strength braced it in two directions and that sturdy copper wires stayed it in the other two.

The two guy cables did not break when the poles to which they were attached came down, and the two guy anchors remained firmly in the ground. In fact, when new poles were substituted the next morning for pole 2667 and for the stub pole, the old guy cables were attached to them. Neither pole 443 nor 2668 came down,

but the two copper wires which ran from pole 443 to 2667 snapped near 443 and then the released tension flung the wires to a place about 50 to 75 feet west of 2667. One of the respondent's witnesses testified that the two wires which ran between 2667 and 2668 snapped and sprang westerly 50 to 75 feet. It is possible that he misspoke himself and that he meant the wires between 2667 and 443, but we will deem that he spoke correctly.

The above is not the only evidence which indicates whether or not pole 2667 was securely fastened in place. The record shows that on December 4, 1945, that is, 17 days before the alleged mishap, a windstorm of surpassing violence visited the Portland-Vancouver area. The wind blew sixty miles an hour and some gusts reached a velocity of seventy-five miles. Before the storm had spent itself some of the appellant's poles and hundreds of trees were down. Many trees fell upon electric wires, thereby causing power and telephone poles to fall. Pole 2667 withstood the force of the storm.

Mr. Jay A. Sly, of Vancouver, assistant division superintendent of the appellant, testified:

> "Normally speaking, when a pole rots off it does not fall to the pavement. The wires hold it in the air unless there may be a series of three or four poles fall."

He was familiar with pole 2667, and testified:

> "A pole such as this one, I would say, couldn't fall without a mechanical—without some force striking it or striking some part of the system."

Mr. Wallace Holmberg, general foreman in the employ of the appellant, visited the scene of the mishap early in the morning of December 22, 1945, for the pur-

pose of determining the amount of restoration that was needed. In making his inspection he observed the parts of pole 2667 which we have described. We now quote from his testimony:

"Q. Did you find enough sound wood in the center to support the pole under all normal operating conditions?

"A. Yes, I did."

Mr. Mangold testified that the No. 6 conductors which ran from pole 2667 to 2668 and also from 2667 to 443 were able to support pole 2667, "particularly" in view of the fact that the wires were in pairs. He was unfamiliar with pole 2667, but answered in the affirmative a hypothetical question which included all of the facts we have delineated and which asked whether or not a substantial amount of force would have to be applied to that pole or to the guy wire to its west to cause the pole to fall. His answer was, "Yes, it would take a substantial force." Upon cross-examination, he testified that although a six-inch pole could have served the functions exacted of pole 2667, " a number of factors" deter power companies from the use of small poles. He explained: "In the first place, they would not last as long as a larger sized pole, larger diameter." Those words, together with some explanation in which he indulged, warrant the belief that poles having a larger diameter than originally necessary are set in the ground so as to allow for decay.

There is nothing in the record to justify a disregard of the testimony just reviewed which was given by Messrs. Sly, Holmberg and Mangold. Their credibility was not attacked and their testimony was not contradicted.

The evidence just reviewed appears to warrant a belief that the charges made by the respondent lack

support. It is true that pole 2667 was partially rotted, but its core was solid and sufficiently large to enable it to sustain safely a load much greater than the one it bore. It seems evident that pole 2667 did not collapse under the weight it carried; its strength was adequate. Further, the pole had strong support from all four sides. It could not fall in an easterly direction unless rid of the guy cable which ran from its top to an anchor 17½ feet west of its base. It could not fall to the south unless freed from the guy cable which ran from its top to the stub pole and then down to an anchor. It could fall neither north nor west unless released from the copper wires which bound it on the south to pole 2668 and on the east to pole 443. That it was secure in its position is attested by the fact that it met the test to which Nature's fury subjected it seventeen days before the respondent's injury. It withstood that attack of unprecedented violence. But before reaching a conclusion, it is necessary to consider some additional contentions advanced by the respondent. The latter argues that in the following-mentioned papers the appellant admitted that pole 2667 was lying upon the pavement when the respondent collided with it: (1) a letter which the appellant's claim agent wrote to the respondent, and (2) a letter and an accompanying paper entitled Remittance Advice, which the appellant's attorney sent to the respondent. He also contends that when the appellant paid to him about $1,900 (to which reference will be made later), it thereby admitted liability for the injury. Finally, the respondent argues that the doctrine of res ipsa loquitur is applicable to this case and that it creates a presumption that the pole fell through the appellant's negligence.

The appellant does not question the authenticity of the letters upon which the respondent relies nor the

authority of their authors. It concedes that before this action was instituted it paid (a) the cost of repairing the respondent's automobile, (b) all charges exacted by the respondent's physicians, and (c) several hundred dollars to him. The three items total about $1,900.

We will now mention the evidence which pertains to those four contentions. The only customer of the appellant who was served by the wires which extended from pole 443 to 2667 and from the latter to 2668 was one Charles R. Byron, whose home is indicated upon our sketch. About 7:45 a.m., December 22, 1945, when Mr. Byron undertook to switch on his electricity he received no service and then discovered that pole 2667 was down. At that point he telephoned to the appellant and thereby it received its first information that pole 2667 had met with a mishap. It did not, however, receive any intimation that the respondent claimed that pole 2667 had injured him until December 24, 1945. Upon that day, according to the respondent, he went to "the Power Company." In view of the fact that he attaches importance to the aforementiond letters and to the appellant's payment to him and for his avail $1,900, it is desirable to know whether or not the respondent claimed before this action was filed and the money was disbursed that the appellant was liable to him on account of anything that happened to pole 2667.

After the respondent had testified that following his accident he went to a physician and became dissatisfied with the treatment he received from him, he continued as follows:

"A. Yes. Then I went and seen the Power Company.
"Q. What power company?
"A. Northwest Electric.

"Q. Where did you go to?

"A. The Vancouver—there is a branch over there.

"Q. Do they have an office there?

"A. Yes. Vancouver.

"Q. Did you make any complaint to them?

"A. Yes.

"Q. Who did you complain to? Do you know the name of the party?

"A. They called up Lamb.

"Q. Called up who?

"A. They called up Lamb over at Portland, an adjuster.

"Q. Who is Lamb?

"A. The Northwestern Electric Company adjuster. He came out to see me."

The above is taken from the respondent's direct examination. Further examination by the respondent's counsel developed the fact that Mr. Lamb was the appellant's claim agent and that his visit to the respondent was made December 27, 1945. By answering "yes" to the above-quoted question, "Did you make any complaint to them?" the respondent made his only intimation that he voiced any "complaint" to the appellant. He left undisclosed, however, the subject of his complaint and did not reveal what he told Mr. Lamb. After more questioning by his counsel, the respondent swore that Mr. Lamb sent him to Dr. Wiswall, of Vancouver, who treated him for "probably a month or two." Later, he came under the care of Dr. Kimberley, of Portland. and, finally, Dr. Begg, also of Portland, became his physician. Representatives of the appellant suggested those physicians. The charges they made constitute parts of the total of $1,900 which we mentioned. Respondent was asked by his counsel: "Did

you have any discussion with Mr. Lamb, the Claim Agent, regarding damage to your automobile?" He answered: "Yes. He said he would take it and have it fixed up, either pay me for it or get me another one as is, another pick-up." At that point the aforementioned letter written by Mr. Lamb was received in evidence. It came in without objection. Its material part follows:

"After leaving your home on December 27, 1945, the writer went to Spady's Towing Company and consulted with them as to the advisability of fixing your 1935 Dodge pick-up, which was damaged December 21, 1945, when you struck the pole lying in the highway at Harney Hill. Mr. Jack Spady stated that the car was not worth repairing; that in his opinion its present condition was suitable only for junk. This being the case, it appears that a cash settlement with you for the value of this car is the best method of settlement. * * *"

Notwithstanding the statements in the letter, it appears that the car was repaired. After the repairs were completed, Mr. Lamb sent the respondent the appellant's check in the sum of $236.00 which represented their cost. That sum constitutes a part of the total of $1,900 which we have mentioned.

It will be observed that, notwithstanding the fact that he was asked, "Did you have any discussion with Mr. Lamb, the Claim Agent, regarding damage to your automobile?", the respondent did not claim that he told Mr. Lamb that the appellant was in any way responsible for the mishap of December 21, 1945. Close scrutiny of his testimony fails to reveal a single word uttered by him during the period in which the two letters were written and the money was paid showing that he ever asserted that the appellant was to blame for anything that happened December 21.

After Mr. Lamb's letter had been received in evidence, the respondent offered the one written by Mr. Gray. The appellant concedes that Mr. Gray has been its counsel since 1929 and that he was authorized to act in its behalf concerning the subject matter of this action from shortly after the time that Mr. Lamb assured the respondent that the cost of repairing his automobile would be defrayed. The material part of Mr. Gray's letter, which was written August 6, 1946, follows:

> "I hand you herewith Northwestern Electric Company's check No. 5210 in your favor for $250.00 as a payment on account of the injuries sustained by you on December 21, 1945, when you ran into a fallen pole in Clark County, Washington. I have had the form of notation attached to the check changed so that it shows that the check is not made as a final payment or final settlement. The treasurer of Northwestern Electric Company informs me that it is impossible to change the notation on the face of the check which reads as follows: 'In full settlement of account as noted above. If not correct, return with statement of difference', as the bank would consider the check mutilated if this statement was crossed out and would not cash the check. However, as one of the attorneys for the company, I am authorized to assure you that you may safely cash the check and the company will never contend that it is made as final payment, for it is not so intended."

Attached to the letter was the aforementioned Remittance Advice reading as follows:

> "Payment on account of injury sustained December 21, 1945, when Dunning ran into a fallen pole at the top of Harney Hill, Mill Plain Road, Clark County, Washington. This check is not in final settlement of this claim."

When the letter, the check and the Remittance Advice were offered in evidence, counsel for the respondent stated his purpose as follows:

"It is a declaration against their interests, that he ran into a fallen pole. I am not taking any position on liability or non-liability on it. But they denied in their answer—we alleged he ran into a pole fallen across the highway and they deny that in their answer, and it is clearly a declaration against their own interests; * * *

The Court: Does this conclusively establish liability?

Mr. Hanley: That is a question. I don't think so. I am not relying on this to prove my case. I have to prove what I claimed in my complaint, but this goes to show that he did run into—according to the Northwestern Electric Company, he did run into a fallen pole. They deny that in their answer."

While the proffered evidence was awaiting a ruling, Mr. Gray addressed the presiding judge as follows:

"* * * the check, as I recall, was issued to Mr. Dunning in line with our policy to take care of his damage if we were responsible for them, and it is my recollection that he brought the check in and refused to accept it because he didn't like that statement on there that it was in full of any claim that he might have. So that letter was written for the sole purpose of assuring him that by accepting it he would not be estopped later from asking for more aid, if he needed it and was entitled to it. And the reference in my letter to the fallen pole part of it was merely to identify the circumstances, and based on information given me, of which I had no personal knowledge. I had nothing to do with the preparation of the voucher that under the Company's practice is attached to checks as issued."

The appellant's objections were overruled and the three papers (the check, the Remittance Advice and Mr. Gray's letter) were received.

It will be observed that before offering in evidence the three papers just mentioned, the respondent did not say that he had ever asserted that the appellant was liable to him for his injury. How it happened that it paid him any money was not disclosed by him. Upon cross-examination, the latter testified that Mr. Gray told him that he could take treatment from any physician he wished, and that the appellant would defray the charges. Further, upon cross-examination, he said that he talked to someone in the appellant's Vancouver office and told that person "a Northwestern Electric pole was down over there on Harney Hill." Notwithstanding the fact that that answer was succeeded by a score of questions which asked the respondent to elucidate, the answer just quoted is the only information he gave concerning his conversation in the Vancouver office. He generally answered, "I don't remember" or "Not that I remember of." We explain that he claimed that, as a result of his injury, his memory and his capacity for concentration were impaired.

The above is the entire explanation given by the respondent as to how it happened that the appellant (1) paid for the repair of his car and for the services he received from the physicians, and (2) gave him checks for substantial sums of money.

Mr. Gray, as a witness, testified:

"A. The check for $250.00 was being sent to Mr. Dunning in accordance with a former conversation that I had with him, I think in the early part of March, 1946, in which he came to my office with Mr. Lamb, who was then the company's Claim

Agent, and gave me his version of this accident, and I told him then that if the company was responsible for his accident it would compensate him for his injuries and would pay his doctor's bills; and they had already paid for repairing his automobile, I think a sum of about $236.00, and in addition to that, the towing charge from the scene of the accident to Spady's garage. This payment of $250.00 was given to him in accordance with that promise for the reason that at that time I had no knowledge of how the accident arose, other than what he had himself told me. I don't recall whether the check was sent up to my office and given to him with this letter or whether the check was sent to him by the Claim Agent and he refused to cash it or he was afraid to cash it on account of the statement that appears right on the face of the check, 'In full settlement of account as noted above. If not correct, return with statement of difference.' He said that he was afraid to cash the check for fear that he would never get any more, and to reassure him on that ground I told him that that would not be used against him, that if he was entitled to more money he would never be refused it because of that recital on the check, and I explained to him that we couldn't —what he wanted was to have that struck off the check, and I told him that could not be done because if it was and it went into the bank to be cashed, the bank would say it was a mutilated check, or altered, and they would refuse to cash it, but I was sure this letter would protect him. That was the explanation that I gave him, and the check was cashed and other checks cashed subsequently, and the company never relied on that statement on the check that it was in full payment.

"Q. Mr. Gray, at the time the complaint in the action was filed, sometime in March, 1947, I believe, did you have available any information from any eyewitness of the accident, other than such information as Mr. Dunning himself had given you?

"A. No, I did not. Until after the complaint was filed and a separate investigation was made, I did not know of any witness except Mr. Dunning himself, who claimed to have seen this accident or heard it, or knew anything about the accident itself.

"Q. After the complaint was filed, explain what, if any, measures were taken then for a further investigation of the facts.

"A. Well, I requested the company to assign someone specifically to devote as much time as was necessary to investigate this case, preparing maps, pictures, making necessary measurements, and finding any more witnesses, if any were available; and Mr. Mangold was assigned by the company to make that investigation.

"Q. Was the first contact made with Mrs. Kempf and Mr. Sullivan and Mr. Bryon after that time?

"A. Yes. To the best of my knowledge nobody connected with the company knew that they knew anything about this case until after this suit was filed and they were interviewed by Mr. Mangold.

* * *

"A. That is what the voucher says, but when Mr. Dunning first came to me and wanted some money, he commented upon the fact that he was not working and had some bills, so—that was the basis for giving him a check, and the matter of payment on account of his injury was not specifically mentioned except in line with my conversation with him, that if the company was responsible, they intended to compensate him, and up to that time I had no knowledge that the company was not responsible and had given him the benefit of the doubt and assumed the truth of what he told me.

* * *

"Q. What caused you to change your mind on it? Wasn't it the filing of the lawsuit?

"A. As you are asking what caused me to change my mind, I will have to put it in this way,

Mr. Hanley: When this accident was first reported to Mr. Lamb, it is my understanding that he talked with Mr. Dunning and also referred him to the doctor. Mr. Lamb had then—while he may have had the opportunities for getting further information, he apparently didn't avail himself of it. It came up during the Christmas week, and I happen to know, of my own knowledge, that Mr. Lamb, in addition to being the company's Claim Agent, was then also its Right of Way Engineer, and at that time most of his time was taken up with securing a right of way for the Albina transmission line out to this Troutdale plant, and my state of mind tells me that he didn't put the energetic investigation into this case that he should have. And so far as I know, he never talked to anyone who knew anything about it except Mr. Dunning, and he apparently gave Mr. Dunning the benefit of the doubt. In that connection I might add that—I don't know whether it is in evidence or not, but Dr. Wiswall's first report indicated the man was disabled for only a couple of weeks.

\* \* \*

"Q. You had Mr. Lamb's word for the condition of the pole and the happening of the accident before any money was paid to Mr. Dunning, isn't that correct?

"A. As far as I know, Mr. Lamb knew nothing about the condition of the pole because he didn't even hear of the accident until several days after it happened, and I understand when he went out there the pole had been completely replaced.

\* \* \*

"Q. Is that a practice with your company, to pay out sums of money like you have testified you paid out to Mr. Dunning, just upon what a claimant says to you?

"A. It might be, unless we had some notice to the contrary. And I will frankly admit this went along much farther than I thought it was going to.

\* \* \*

"A. Probably if we had been able to settle the case on a reasonable basis—and I am not prepared to say what a reasonable basis would be, because I didn't know the extent of his injury or when he was going to be well—it is quite within the realm of possibility this case would have been settled, but when we were unable to agree and he filed the suit, that precipitated or forced an investigation that perhaps might never have been made and would not have been made if we had agreed upon a settlement. And after the investigation was made, we decided we were not liable at the outset and probably should never have paid him any money in the first place."

There is nothing in the record at variance with Mr. Gray's testimony. After he testified, the respondent did not resume the witness stand and no testimony given by him contradicts anything which Mr. Gray said.

By reverting to the questions which were put to Mr. Gray, it will be seen that one of them mentioned "Mrs. Kempf, a Mr. Sullivan and Mr. Bryon." It will be recalled that Mr. Gray swore that the appellant had no knowledge of those individuals until after all of the aforementioned payments had been made to the respondent, this action had been filed and an investigation was instituted.

Mrs. Kempf lived in a house about 125 feet from the place where pole 2667 stood. We indicated on our map the approximate location of her home. She swore that at about 1:00 a. m., December 21, 1945, she was startled by a very loud noise which she described as follows:

"A terrific crash and splintering; it sounded like a swish, like something drug on the cement \* \* \* just like lightning hitting a house, just a

terrific crash, and it sounded like splintering and then this swish.''

She heard only this one report. It will be recalled that the respondent claims that he collided with the pole at approximately 1:00 a. m. The witness testified that presently she heard people talking and, upon going to the highway, she saw the overturned truck, a bus and some people.

Mr. Bryon, also mentioned by Mr. Gray, lived in a house which we identified on our sketch. He was the sole customer served by the wires which ran from pole 2667 to 2668. He swore that on the night of December 21, 1945, he left Portland in his automobile, passed through Vancouver and reached his home about 12:20 or 12:30 a. m. His course took him within about 160 feet of pole 2667. He noticed, so he said, nothing upon the pavement at that time. Upon entering his house he turned on his lights and about 12:35 or 12:40, after having a light repast, turned them off and went to bed. Thus, at that hour pole 2667 must have been standing and the wires running from it to 443 must have been intact. Mr. Bryon declared that about 1:00 a. m. he heard ''a terrific crash'' and added that he heard only one.

Mr. Sullivan, who was the third person whom Mr. Gray mentioned, operated a bus over a route which took him past pole 2667. On the night of December 21 he left the Vancouver bus depot at 12:15 and about ten minutes later passed pole 2667. According to him, there was no obstruction in the road at that point and pole 2667 was standing. He reached the end of his line shortly prior to 12:45 a. m., and at 12:45 started upon his return trip. At about 1:00 a. m. he was again opposite pole 2667, so he swore. A few moments prior to

reaching that point he observed the headlights of an approaching car which, it developed, was the respondent's. The witness testified that the respondent's car "seemed to be way over on the right-hand side. He was at the extreme right side of the road. * * * He might have been off the pavement." He estimated the respondent's speed as 30 to 35 miles an hour. Presently the bus was opposite pole 2667, but, of course, it was on the north half of the pavement, whereas the pole stood six and one-half feet south of the pavement. When the bus was in the position just mentioned, the respondent's car, according to Sullivan, was very near the pole. We now quote from the witness' testimony; his reference is to the respondent and the latter's car:

"It seemed like he kind of climbed up something and flopped over. * * * I seen him hit something; he seemed to climb right up in the air."

According to his further explanations, he thought that the respondent either climbed up the guy wire attached on the west to pole 2667 or struck the pole. The witness swore that he heard a loud crash and immediately stopped his bus. When he alighted he saw the overturned pick-up truck and the three broken parts of pole 2667. He also saw the respondent "wandering around." The witness knew the location of a telephone call box 400 or 500 feet away, rushed to it and in that way two deputy sheriffs were summoned. When Sullivan returned to the scene of the crash the respondent had departed, but his overturned car was still there, with its headlights burning.

The respondent conceded that Sullivan's bus simultaneously approached the scene of the mishap, but swore that the pole was down when he collided with it. According to him, he struck the fallen pole immediately

before the bus reached that spot and the presence of the pole upon the pavement prevented the bus from continuing upon its course. He explained: "He (Sullivan) stopped because he couldn't get over the pole because the pole was knocked down." He added that the bus remained stalled until the road was cleared. Thus we see that, if his testimony reflects the truth, the shattered pole effectively blocked the road, not only for cars driving east, but also for those going west. The respondent also testified that he was driving on the pavement when he struck the pole and that his speed was fifteen miles an hour. As we have seen, Sullivan swore that the pole was still standing when he passed it on the opposite side of the road and that it did not fall until his bus was safely beyond it.

Two deputy sheriffs of Clark County (L. B. Gregg and Gustave A. Bock) reached the scene of the misadventure a few minutes after Sullivan made his call. The two put out flares to warn cars on the highway and then worked for an hour before they had cleared the road for travel. The removal of the entangling wires consumed much time. In the respondent's automobile they found two empty whisky bottles which they threw away and failed to mention in their report. Both of the deputy sheriffs were called to the witness stand by the respondent, and the description contained in previous paragraphs of this opinion concerning the condition of pole 2667, its wires and guy cables was taken largely from their testimony. Mr. Gregg testified that there was attached to the lower part of the guy wire which extended from the top of pole 2667 to the guy anchor a sturdy metal guard, seven feet or so in length. He swore that it was "badly bent" and that it gave the impression of having been struck by some-

thing. We quote the following from testimony given by Mr. Bock. Its first part concerns the guy cables which ran from the top of pole 2667 to the anchor 17½ feet west of the base of that pole:

"Q. This guy wire that—I don't know whether you noticed this or not. This guy wire on this pole 2667 extended to the south and was not broken, was it? from the pole, this heavy guy wire?

"A. No sir, it wasn't broken.

"Q. And towards its bottom it was covered with sort of a semi-circular metal protector, wasn't it?

"A. Yes, sir.

"Q. Did you notice whether that was bent?

"A. It was bent, yes, sir.

"Q. Badly?

"A. Well, it had a pretty good bend in it, I wouldn't say as to how much, but apparently it had been struck by something."

Some of the members of the repair crew that restored service the following morning also described the guy guard. Since it had been exposed to the weather for many years, a dull, gray patina had settled upon it. According to the members of the crew, the upper part of the guard, beginning at a point about eighteen inches from the ground and extending upward several feet, was bright and shiny as if some heavy object had slid upward along it. They described the damaged guard as crescent-like in shape, and swore that it was so badly bent that they threw it away.

The respondent swore that as he approached the scene of his alleged injury he saw no other cars except the bus which was approaching from the opposite direction. That fact appears to be consequential, because, according to him, the presence of the shattered parts of pole 2667 upon the pavement blocked the highway

and prevented cars from getting through. It will be recalled that he swore that when he attempted to drive on, the section of the pole lying upon the south half of the pavement overturned his car and that another piece of the shattered pole lying upon the north half of the pavement compelled the bus to stop. A map, which constitutes a part of the respondent's brief and which was prepared by his counsel, shows that the south side of the road was blocked by the middlesection of the pole and the north half by the upper section. Further, if the four copper wires, after snapping, lay upon the road in the manner described by the respondent's witnesses, they and the two guy cables must have constituted an insurmountable entanglement through which no car could have proceeded. Giving effect to all of the foregoing, it seems strange that the respondent, upon approaching the scene of his alleged injury, encountered no stalled cars, unless the pole had lain upon the pavement for only a few moments before the respondent got there. According to the respondent, he had scarcely crawled out of his overturned truck before other cars that were using the highway were compelled to stop. For instance, he said: "Oh, there must have been eight or ten cars from the Heights. And the bus was there too." In fact, he said that within a few moments cars had accumulated which had come from both sides of the obstruction. It will be remembered that the respondent left the scene of the accident about five minutes after its occurrence and, hence, all of the stalled cars which he mentioned gathered in that short time. Mr. Gregg testified that before he had set his warning flares "several other cars" had come to the scene. Upon reaching the site of the crash, he observed a car "say, fifty or sixty yards from the wreck" from which the driver did not dismount. That

car "went off down the road" as soon as the flares were set.

The above is a sufficient review of the evidence.

■ The statement made in Mr. Lamb's letter, " * * * struck the pole lying in the highway"; the one in Mr. Gray's letter, "* * * you ran into a fallen pole"; and the recital in the Remittance Advice, "Dunning ran into a fallen pole" were admissions that the pole was down when the respondent's car collided with it. Those statements were admissions against interest and were adverse to the contention which the appellant urged during the trial; that is, that the respondent himself knocked down pole 2667. Mr. Gray and Mr. Lamb wrote their statements when each was the alter ego of the appellant and was transacting its business in conformity with authority which had been conferred upon him. The statements were not idle narrative, but parts of the transactions that were under way when the words were written. They were, therefore, the admissions of the appellant.

By reverting to the contentions made in the petition for a rehearing, it will be observed that the appellant does not now challenge the ruling of the trial judge which held admissible Mr. Gray's letter. Mr. Lamb's letter was received without objection and was never the subject matter of an assignment of error. But the appellant argues that Mr. Gray's explanation deprived the admissions of any probative value. Mr. Lamb did not testify, and the identity of the author of the Remittance Advice was not divulged. That person, whoever he may have been, did not testify, but the paper which he typed emanated from the appellant as one of its declarations. The members of this court do not question Mr. Gray's word or credibility; he is held by us in

the highest esteem. But we have no right in instances like this to weigh evidence, determine its value or discard any which was properly admitted and which is substantial. Mr. Gray's testimony did not expunge the admissions. After he had spoken, the admissions still remained a part of the record. It was the province of the jury to consider them and also Mr. Gray's explanation. After having considered both, it was the jury's duty then to determine whether the explanation had siphoned the admissions of their probative value. This is an appeal from the judgment, not from the verdict. It is our duty to deem that the admissions are still a part of the evidence, notwithstanding Mr. Gray's explanation.

The appellant argues, as we have already indicated, that "the Court (this court in its previous decision) erred in holding that the trial court did not err in denying defendant's motion for a directed verdict; and, after verdict, in denying defendant's motion for a judgment in its favor, notwithstanding said verdict." For the reasons just stated, it is our duty in determining the merits of those contentions to believe that the respondent's averments that the pole was upon the pavement when the collision took place were supported by substantial evidence; that is, by the admissions. Accordingly, from this point on we will assume that the jury believed that pole 2667 was upon the pavement when the respondent's car struck it.

But, even if the pole was upon the pavement when the respondent's car struck it, the appellant was not liable for the consequences unless its negligence was responsible for the presence of the pole upon the pavement. It was incumbent upon the respondent to present substantial evidence showing that (1) negligence

attributed to the appellant caused the pole to fall, or (2) if the pole got upon the pavement without the appellant's fault, to present substantial evidence showing that a sufficiently long period of time had elapsed that, had the appellant exercised reasonable diligence, it would have removed the pole. See *Boyd v. Portland Electric Co.*, 40 Or. 126, 66 P. 576, 57 L. R. A. 619, 29 C. J. S., Electricity, § 45, p. 591, and 18 Am. Jur., Electricity, § 100, p. 496.

Let us now consider whether the record contains any evidence showing that the fall of the pole was due to the appellant's negligence. In a preceding paragraph we stated that the only evidence upon that subject which the respondent presented indicated (a) at the time of the mishap "a light breeze" was blowing, and (b) the part of the pole 2667 at the ground level was partially decayed. In view of the fact that the violent windstorm of December 4, 1945, did not faze pole 2667, it would be unreasonable to believe that the "light breeze" of December 21 brought the pole to the ground. Since the pole was securely braced at the four points of the compass, we do not believe that it can be said that the decay at its base caused it to fall. The unchallenged testimony shows that even when decay affects the entire base of a pole the conductor wires prevent it from falling. It seems reasonable to infer that if someone had chopped through the base of this pole with an axe, the guy cables and conductor wires would have prevented it from falling. Accordingly, we reject these two contentions as explanations for the presence of the pole upon the pavement. But the respondent claims that the doctrine of res ipsa loquitur is applicable and that it supplies an inference that the negligence of the appellant was responsible for the fall of the pole.

 There is nothing mysterious about the manner in which the rule, which has become identified by the shibboleth res ipsa loquitur, operates. That rule is merely a process of common sense reasoning. It assists in drawing logical inferences from circumstantial evidence which has been presented in negligence cases. The rule is as much discussed in treatises on the subject of negligence as in those which portray the rules of evidence. It is not the exclusive property of either of those branches of the law. It is a process of deductive reasoning which has been safeguarded by judicially imposed restraints. Even in jurisdictions like Michigan, which say they do not recognize the rule, the same process of reasoning from facts to inference is employed. Therefore, nothing of consequence hinges upon the name, although the latter is a good index to the process of inference-drawing which the rule that bears that name authorizes; that is, the accident must have been of such a nature that it speaks and accuses the possessor of the instrumentality, which injured the victim, of negligence. There is nothing artificial about the rule. It favors neither party with any make-weights—as, for instance, presumptions—that were coined in the mints of lawmakers. It gives to circumstantial evidence in negligence cases its real value, nothing more and nothing less. The rule operates upon the hypothesis that sometimes circumstantial evidence satisfactorily proves negligence and that in some instances it is impossible, or virtually so, for an injured person to present direct evidence that he was injured as a result of negligence committed by the party who is now cast as the defendant. His inability to present direct evidence is assumed to arise from the fact that the alleged tort feasor had exclusive control and possession of the instrumentality which it is said inflicted

the injury. The inference draws much of its strength from the fact that the rule is applicable only to instrumentalities which inflict no injury when those in charge exercise ordinary care. It refuses to lend itself to any other kind of instrumentality. Like all deductive reasoning, the process known as res ipsa loquitur accepts only some fact situations as sound premises from which to infer negligence. As was said by Chief Judge Crane, in *Galbraith v. Busch,* 267 N. Y. 230, 196 N. E. 36, the rule can be applied only when "the circumstances of the case unexplained justify the inference of negligence." The premises which it has come to deem acceptable were chosen because human experience shows that when they exist it is safe to infer that the party was injured through negligence committed by the party who was in charge. Wigmore on Evidence, 3d Ed., § 2509, gives the following as the premises which time has shown are safe: (1) The instrumentality must have been of a kind which ordinarily injures no one when due care is exercised; (2) the defendant must have had exclusive control; and (3) the injury must have occurred irrespective of anything that was done at the time by the injured party. It will be observed that proof of those three elements reveals only the circumstances. It does not directly prove any act of negligence upon the part of the purported tort feasor. Res ipsa loquitur deems as satisfactory circumstances from which an inference of negligence may safely be drawn proof showing (1) the injury, (2) exclusive possession of the injury-inflicting instrumentality by the alleged tort feasor, (3) nonparticipation by the victim, and (4) the fact that when due care is exercised the instrumentality injures no one. The inference, however, is only permissible—it is not mandatory. It is always rebuttable.

It will be observed that the rule is applicable only to injury-inflicting instrumentalities which are in the possession and control of the alleged tort feasor. The reason for the requirement is self-evident. This court has emphasized that requirement. Two recent instances are *Asheim v. Fahey,* 170 Or. 330, 133 P. 2d 246, and *Doherty v. Arcade Hotel,* 170 Or. 374, 134 P. 2d 118. An occasional relaxation of the requirement has been permitted under circumstances which are unlike those before us; an illustration is *Chutuk v. Southern Counties Gas Co.,* 21 Cal. 2d 372, 132 P. 2d 193.

■ The power pole of the appellant, which the respondent avers fell and caused his injury, stood in the public thoroughfare six and one-half feet from the edge of the pavement. A public sidewalk ended three or four feet east of the pole. Had the walk been continued westward, the pole would have stood between the pavement and the sidewalk. Thus the pole stood in a public place which was available to everyone. Unless the Clark County officials exercised greater control than is displayed elsewhere, we assume that the lower surface of the pole was occasionally employed as a place for tacking public notices. We also assume that in highway construction and repair the public engineers were free to move the material at the base of the pole. In short, although the pole belonged to the appellant, the latter did not have exclusive control over the place where it stood.

The respondent, of course, does not contend that he was injured by an electrical wire which, upon breaking, dangled over the road. Nor does he say that he was injured by a fixture which had dropped from its fastener. Wires, fixtures and transformers are fastened many feet above the thoroughfare and, there-

fore, are safe from interference by those who pass along the street. It can be truthfully said of them that they are in the possession and under the control of their owner. When one of them falls into the street, the owner can justly be called upon for an explanation. But this pole was as accessible to the public as to the appellant. It stood within four or five blocks of the place where the respondent lived. Unlike the respondent, no representative of the appellant was present at the scene of the accident or had information that the pole purportedly injured someone until four days later.

It is no longer a novelty to encounter in the daily press news items describing the havoc wrought when a motor car collided with a shade tree, a fire hydrant or some other object which stood in the parking adjacent to the street. And we also occasionally encounter news items which tell of a car that knocked down a power pole and thereby deprived a section of a city of its electrical service. The owner of a power pole which stands in a thoroughfare, like the possessor of a shade tree or a fire hydrant, does not have exclusive possession of it. In the event it comes down and litters the pavement, it may be that he can not, without pursuing an inquiry throughout the neighborhood, account for the mishap. See *Cooper v. Village of Brockport,* 276 N. Y. 521, 12 N. E. 2d 457.

Without pursuing the matter further, we express our belief that the pole in question was not sufficiently within the appellant's control and possession to have brought the situation within the rule of res ipsa loquitur. We do not believe that rule is applicable to objects such as power poles, shade trees and letter boxes which stand in the public thoroughfare and which are available to all. Although we have full con-

fidence in that conclusion, we shall go on and consider another phase of res ipsa loquitur.

■ As we have seen, res ipsa loquitur deals with circumstantial evidence. When evidence of that kind meets the requirements of that rule, negligence may be inferred. However, the rules of evidence demand that if circumstantial evidence, in addition to permitting an inference favorable to the proponent, authorizes other inferences, some of which are hostile to him, the proponent must go on and present other evidence showing that the favorable inference is the most logical: *Sullivan v. Mountain States Power Co.*, 139 Or. 282, 9 P. 2d 1038, and *Judson v. Bee Hive Auto Service Co.*, 136 Or. 1, 294 P. 588, 297 P. 1050, 74 A. L. R. 944.

In the Bee Hive case just cited, this court declared:

"We have said that defendant was not entitled to a nonsuit, for the reason that plaintiff had established a prima facie case. However, it does not follow, if the prima facie case is based solely upon an inference or presumption, that the court has no right to withdraw the cause from the jury after all of the evidence has been submitted. * * * It is entirely reasonable that one inference may be drawn during one stage of the trial and a different one at a later time, after all the evidence is in the record. At the close of plaintiff's case in chief, it might have been reasonable, in view of proof of defendant's ownership of the automobile to infer that Mills was driving the same for the owner's benefit; but would such inference still obtain after it had been shown by clear, positive and uncontradicted evidence that Mills had rented the automobile from defendant, and was driving it for his own pleasure? * * * Under such circumstances, the jury will not be permitted by law to arbitrarily and capriciously say that the weight of the evidence predominates in favor of plaintiff upon whom rests the burden of proof."

The same rule, that is, that the favorable inference drawn from circumstantial evidence must outdistance competing inferences, was employed in *Loebig's Guardian v. Coca-Cola Bottling Co.*, 259 Ky. 124, 81 S. W. 2d 910, wherein the court said:

"The doctrine of res ipsa loquitur assumes, at least prima facie, the existence of negligence from the mere occurrence and injury. Since the principle applies only to cases where the existence of negligence is a more reasonable deduction from the circumstances, it should not be allowed to prevail where, on proof of the occurrence, without more, the matter still rests in conjecture alone."

The court held that since some of the evidence warranted a deduction that the defendant was not negligent, and that since that deduction was at least as logical as the inference of negligence supplied by the doctrine of res ipsa loquitur, the plaintiff was not entitled to prevail.

In *Brown v. Capital Transit Co.*, 127 Fed. 2d 329, the court reasoned:

"Where the res ipsa loquitur doctrine is applicable, it means no more than that the party claiming damages has produced proof of a fact, or a series of related facts, which warrant the inference of negligence, not that they compel such an inference. The rule is so stated by the Supreme Court in Sweeney v. Erving, 228 U. S. 233, 33 S. Ct. 416, 57 L. Ed. 815. Where, as here, it is a matter of surmise that the damage was due to a cause for which the defendant is liable, the doctrine is inapplicable. If causes other than the negligence of the defendant might have produced the accident, the plaintiff is bound to exclude the operation of such causes by a fair preponderance of the evidence. Here the sum and substance of appellant's evidence is that an injury occurred."

In *Stewart v. Crystal Coca-Cola Bottling Co.*, 50 Ariz. 60, 68 P. 2d 952, the court said:

"Inasmuch, therefore, as it is just as probable that the explosion was due to the action on glass of sudden changes in temperature as it is that it was caused by an overcharge of gas or a defective bottle, the rule of res ipsa loquitur does not apply. It is only where the existence of negligence is a more reasonable deduction from the facts shown that a plaintiff is permitted to call this rule to his aid. It 'should not be allowed to prevail where, on proof of the occurrence, without more, the matter still rests on conjecture alone.' * * *

"This court in Sawyer v. People's Freight Lines, 42 Ariz. 145, 22 P. (2d) 1080, 1082, quoted this sentence for the purpose of pointing out when res ipsa loquitur applies, 'There are happenings attended by such circumstances as that the story of what happened cannot be told without disclosing the responsibility for what happened,' and stated that the telling of what occurred in that case did not disclose who or what was responsible for the accident resulting in the death of the plaintiff's decedent. It occurs to us that nothing could be more in point, because the narration of the facts connected with the explosion in this case assures no one as to its cause but leaves the matter wholly in doubt. It is purely a guess whether it was due to an overcharge of gas or a defective bottle, either of which defendant might be responsible for, or whether it was caused by the action on glass of a sudden change in temperature, for which it was not. And this being true, the following statement in Biddlecomb v. Haydon, supra, is particularly pertinent: 'Neither does it (res ipsa loquitur) apply where the cause of the accident is unexplained and might have been due to one of several causes for some of which the defendant is not responsible.' "

In *Johnston v. Black Co.*, 33 Cal. App. 2d 363, 91 P. 2d 921, it appeared that the plaintiff was injured while reclining upon a fluoroscopic table which, unbeknown to the defendants, had become defective. The plaintiff depended upon res ipsa loquitur. According to the decision,

"the defendants took up the proof and introduced evidence to the effect that the fluoroscopic table was purchased about eight years before the date of the accident from a reliable manufacturer, that the table was of standard make, that many others were being used in the state of California and elsewhere and that some of them have been in use for about twenty-five years. The defendants' table was in daily use and sometimes was used three or more times a day. It was, at frequent intervals, oiled, cleaned, inspected, and minor repairs made thereon. Prior to the accident to the plaintiff nothing had occurred that indicated any weakness in or wear on the metal pin which broke. Prior to the moment of the accident the defendants had no notice whatever of any defect in the pin or in the table."

After stating those facts, the court held:

"Having introduced the evidence above mentioned the inference on which the plaintiff relied was dispelled as a matter of law. Engstrom v. Auburn Automobile Sale Corp., 11 Cal. 2d 64, 77 P. 2d 1059. In the cited case, having called attention to the difference between a presumption and an inference, 11 Cal. 2d on page 70, 77 P. 2d on page 1063, the court said: 'On the other hand, an *inference* is dispelled as a matter of law when it is rebutted by clear, positive, and uncontradicted evidence which is not open to doubt, even though such evidence is produced by the opposite side. Maupin v. Solomon, 41 Cal. App. 323, 324-326, 183 P. 198; Martinelli v. Bond, 42 Cal. App. 209, 183 P. 461.' It follows that the evidence contained in the record

would not support a verdict for the plaintiff whether the instructions complained of were technically correct or otherwise.''

In *Stephens v. Virginia Electric & Power Co.,* 184 Va. 94, 34 S. E. 2d 374, the plaintiff claimed that she was injured by an electrical current which, according to her, leaped from a switch box that the defendant maintained, and entered her body. The switch box was fastened to one of the defendant's power poles which stood in the public street and which, upon the approach of a street car, threw a switch. The plaintiff described the circumstances and for proof that the switch box was negligently maintained depended upon an inference of negligence arising from an application of the rule res ipsa loquitur. The defendant presented proof showing that the box was of standard make and that it was so constructed that electricity could not accumulate in it. The court said:

"We must accept her statement even though it is against the preponderance of evidence."

It then reasoned:

"We said in Norfolk Coca-Cola Bottling Works, Inc. v. Krausse, 162 Va. 107, 173 S. E. 497, that the doctrine of res ipsa loquitur is an evidential presumption sometimes resorted to in the absence of evidence, but that it is not to be applied when evidence is at hand. * * *

"In the case at bar there was an entire absence of any evidence which tended to show the existence of a single circumstance or condition which, if followed by the defendant, would have disclosed any defect in the coil.

"There is no evidence which established or tends to establish that the defendant violated any duty which it owed the plaintiff. It is not even suggested that there are better methods of installation,

maintenance, inspection, and operation than those employed by the defendant. In fact, the evidence shows conclusively that there are no better methods than those used by the defendant. In the face of this evidence any presumption of negligence which might have been raised as a result of the application of the doctrine of res ipsa loquitur completely disappears. The burden of proving her case rested upon the plaintiff. The evidential presumption of negligence under the doctrine upon which she solely relies having been dissipated by clear and uncontradicted evidence, there remains no evidence to support her case.''

In *Heard v. Arkansas Power & Light Co.*, 201 Ark. 915, 147 S. W. 2d 362, it appeared that the plaintiff, an employee of the defendant, was injured in an explosion which occurred in an underground transformer vault which the defendant maintained and in which the plaintiff was working at the time of his injury. Reliance was had upon res ipsa loquitur. The court said:

"For the purpose of this opinion only, we assume that the doctrine is applicable to the facts of this case."

It held:

"Here, the undisputed proof on the part of appellee shows that there was no lack of care on its part, nor is there any proof in the whole case that the accident could not have happened but for appellee's negligence. So, conceding that the res ipsa doctrine is applicable and that proof of the happening of the accident raised a presumption of negligence, still the proof on the part of appellee overcame the presumption, blotted it out, as it were, and it thereafter served no purpose in the case. There was therefore no question of fact to be submitted to the jury, in so far as the res ipsa doctrine is concerned, and the court correctly so held."

In *Galbraith v. Busch,* supra, the plaintiff relied upon res ipsa loquitur and the defendant presented no evidence. In reversing a judgment for the plaintiff, the decision said:

"The problem in each case is whether the circumstances unexplained do justify an inference of negligence. Ordinarily, circumstantial evidence is insufficient where the circumstances are consistent with freedom from wrong. In the administration of the law, arbitrary rules cannot be substituted for logically probative evidence. The doctrine of res ipsa loquitur is not an arbitrary rule. It is rather a common-sense appraisal of the probative value of circumstantial evidence. It requires evidence which shows at least probability that a particular accident could not have occurred without legal wrong by the defendant. To negative every possibility that the accident occurred in some extraordinary manner which would exculpate the defendant is often impossible. * * *

"The evidence, though unexplained, cannot possibly lead to an inference that the accident was due to lack of care in the operation of the automobile, for the probability that it occurred from a break in the mechanism is at least equally great. All that the evidence shows is that the accident may have occurred from any one of many causes, including perhaps, negligence in operation."

We shall review the decisions no further. We know of none that are contrary to the above.

Since the evidence in this case does not show that the appellant had possession of and control over the pole to such an extent that it could properly be required to explain the mishap, res ipsa loquitur was not applicable. The injury, the presence of the pole upon the pavement and the surrounding circumstances did not naturally speak of and accuse the appellant of

negligence. Rather, the evidence which the respondent himself introduced showed that the pole was secure in its position and that it could not have fallen unless brought to the ground by a powerful mechanical force. Far from showing negligence upon the appellant's part, the evidence introduced by the respondent refuted it. That evidence, in its description of the damaged guy guards, gave an inkling of the cause of the mishap—it pointed to a motorist whose uncertain course had brought him into violent collision with the west guy cable as the cause of the pole's presence in the street.

But, notwithstanding the foregoing, the burden of proof was shifted to the appellant, possibly under a belief that the respondent's evidence warranted an inference of negligence. Unchallenged evidence which the appellant presented after the burden had been shifted to it in the manner just mentioned showed (1) that the pole was properly erected, (2) that notwithstanding its partial decay it possessed ample solid wood to bear the load it was required to sustain, and (3) that it was so securely braced that it could not fall unless violently assaulted by a powerful mechanical force. Further, the evidence showed that seventeen days before the respondent's injury, the pole withstood an attack made by Nature itself in unprecedented violence. Without resorting further to the evidence, we express our belief that there is nothing in the record which sustains any of the charges of negligence. The record is devoid of proof of any negligence upon the appellant's part.

From the foregoing, it is seen that no inference is warranted that the presence of the pole upon the pavement when the respondent approached it was due to the negligence of the appellant. Assuming, as we must from the appellant's admissions, that the pole was

down when the respondent collided with it, we are required to infer that someone knocked it down before the respondent came upon the scene. For the reasons stated in a preceding paragraph, no finding is permissible that the pole lay upon the pavement for more than a very few minutes before the respondent collided with it. There is no contention that the appellant knew of the pole's presence upon the pavement, and none that it had lain there long enough to have charged the appellant with notice of the mishap.

There remains for consideration only the question as to whether or not the appellant's payment to the respondent of approximately $1,900 constituted an admission of liability upon its part. We have quoted Mr. Gray's uncontradicted and unchallenged testimony showing that when money was paid to the respondent he was told that the appellant had no information about the accident except that given to it by the respondent, and that he was further told that the money was being given to him in reliance upon his word. Thus the respondent knew that the appellant was not conceding liability unless his explanation concerning the manner in which he was injured portrayed the truth. If payment constituted an admission, the latter was conditional.

Although it at first seems strange that the appellant's claim agent, without making any investigation of the accident, promised that the appellant would defray the cost of the car's repair, Mr. Gray's explanation removes some of the strangeness. At any rate, it was done, and the respondent's word was accepted. The fact that (1) the accident occurred after midnight and upon a road which was not a main highway, and (2) that the appellant received no intimation of the respondent's injury until after all evidence of the

wreck had been cleared away may have suggested that an investigation would be fruitless. Further, when the promise was made to defray the cost of repairing the truck, the appellant had reason for believing that the respondent's injury was slight. Moreover, the police reports said nothing about the whisky bottles which were found in the overturned car.

After § 282 of Wigmore on Evidence, 3d Ed., has set forth the rule of policy which generally excludes evidence showing that the defendant is insured, and after § 283 of the same treatise states the rule of policy in regard to evidence of post-accident repairs to the alleged tortious instrumentality, § 283a says:

> "For similar reasons, an *offer to an injured person* to *remedy the harm* suffered should be inadmissible.
> "In particular, the *offer of remedial assistance*, to an injured person, by one whose apparatus or conduct has caused the injury or on whose premises the injury has occurred, ought not to be evidence of an admission of culpable causation."

The rule mentioned by Dean Wigmore was employed in *Briggs v. John Yeon Co.*, 168 Or. 239, 122 P. 2d 444, which, in effect, overruled *McCallister v. Farra*, 117 Or. 278, 243 P. 785, upon which the respondent depends. We believe that the correct rule was also employed in *Moore v. Stetson Mach. Works*, 110 Wash. 649, 188 P. 769, and *Brown v. Pacific Electric Ry. Co.*, 79 Cal. App. 2d 613, 180 P. 2d 424. See also 31 C. J. S., Evidence, § 291, p. 1050. The payments, under the conditions in which they were made, did not constitute any admissions against interest. If they could be deemed admissions, they were conditional; that is, conditioned upon the truth of the respondent's explanation.

█ In view of all of the foregoing, there is no evidence showing negligence upon the appellant's part. The specifications of negligence lack support.

We believe that the contentions advanced upon rehearing must be sustained and that our previous decision was in error. It is overruled. The Circuit Court should have directed a verdict for the appellant. The judgment attacked by this appeal is reversed.

BELT, J., did not participate in this decision.