Argued September 8, affirmed November 19, 1952

SNODGRASS *v.* RISLEY ET AL.

250 P. 2d 392

*Sam Kyle,* of Albany, argued the cause for appellant. With him on the brief was Mark V. Weatherford, of Albany.

*Bruce Spaulding,* of Portland, argued the cause for respondent John Risley. On the brief were Wilbur, Mautz, Souther & Spalding, of Portland, and Karl T. Huston, of Corvallis.

*George A. Rhoten,* of Salem, argued the cause for respondents Carl Steeprow and Elden J. Callahan. On the brief were Rhoten, Rhoten & Speerstra, of Salem, and Karl T. Huston, of Corvallis.

Before BRAND, Chief Justice, and ROSSMAN, LUSK, LATOURETTE, WARNER and TOOZE, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a judgment of the circuit court in favor of the three defendants, Carl Steeprow, Elden J. Callahan and John Risley, which was entered after (1) the court had sustained a motion for an involuntary nonsuit made by the two

defendants first mentioned, and (2) the jury, upon submission to it of the case as to the third defendant [Risley], had returned a verdict in his favor. The basis of the action, which resulted in the entry of the attacked judgment, was a charge that all three defendants, on May 6, 1949, had committed acts of negligence and that as a result thereof the plaintiff suffered a personal injury.

The plaintiff-appellant submits three assignments of error which attack rulings in which the circuit court (1) sustained the motion made by defendants Steeprow and Callahan for an order of involuntary nonsuit; (2) instructed the jury (in plaintiff's cause against Risley) that contributory negligence, if the plaintiff was guilty of any, would bar his recovery; and (3) declined to instruct the jury concerning the purported applicability of the "and generally" clause of the Employers' Liability Act (§ 102-1601, OCLA) to the duties which the defendant, Risley, owed the plaintiff.

The plaintiff sustained the injury for which he seeks redress May 6, 1949, at the log dump of one Bayless Lumber Company, which is located near Philomath, when a log rolled partially off a logging truck and struck him. The load of logs upon the truck was produced by the defendants, Steeprow and Callahan. It was brought to the dump by the defendant, Risley. The plaintiff was an employee of Bayless Lumber Company, which is not a party to this case, and was in charge of its log pond. A part of his duties consisted of scaling logs which were brought to the pond and dumping them into it.

Defendants Steeprow and Callahan, as partners, were engaged in the business of logging. They produced logs at a place about 22 miles from the Bayless mill and sold them to that concern. They had three

employees. Neither of those two defendants nor any of their employees performed services upon the premises of the plaintiff's employer.

Defendant Risley was engaged in the transportation of logs. He owned and operated a truck which was built for log hauling. The complaint, referring to logs produced by Steeprow and Callahan, alleges:

"* * * said logs were then hauled by the said Risley in an independent operation at the rate of so much per one thousand feet from said dock to the dock where the same were unloaded by the said Bayless Lumber Company, and this was an independent and separate operation under the exclusive control, management and direction of the said defendant Risley."

There is no contention that Risley was an employee of Steeprow and Callahan. He had no employee.

The above identifies all of the parties with whom this case is concerned. In short, the defendants, Steeprow and Callahan, were loggers whose place of production was approximately 22 miles from the Bayless Lumber Company to which they sold logs. The logs were hauled from the place of production to the Bayless mill by the defendant, Risley, an independent contractor. We assume from the evidence that Risley's relationship to the producers [Steeprow and Callahan] and the buyer of the logs [Bayless Lumber Company] was no different than if the hauling had been done by a railroad. The plaintiff was an employee of the Bayless Lumber Company and a stranger to the defendants.

Immediately prior to the plaintiff's injury, Risley brought to the Bayless Company's log dump a load of six logs. According to the plaintiff, the logs ranged in length from 40 to 44 feet and in diameter from 16

to 30 inches. They lay upon Risley's truck in three tiers; three constituted the lower tier, two the second, and the sixth was on top.

Risley's truck, which no one claims was defective or unsuitable for hauling logs, possessed two cross-beams which the witnesses termed bunks. A logging truck has no body or bed. Its bunks which lie above its reach serve the same purpose as the bed of a normal vehicle. The bunks are the part of the truck upon which the load of logs rests. They are equipped near their ends with bunk blocks capable of adjustment back and forth. The blocks, when moved into place, keep the lower tier of logs from rolling off the bunks and hold those logs close to each other. The forward part of Risley's truck was the motive or tractor part; the rear part was termed by the witnesses as the trailer. The forward bunk was located at the place where the two parts of the truck united; in fact, a "pin", which ran through the forward bunk and through the reach, held the tractor and trailer together. The rear bunk was near the rear wheels. Items of equipment which Risley employed were three chains which he fastened around the load of logs after the latter had been placed upon the truck. One of the chains was wound around the logs at their forward end, another near the rear end and the third was strung around the logs in the middle of the load. The chains had devices in the nature of levers which enabled Risley to draw them taut and then fasten them in that position.

The plaintiff claims that the logs were negligently loaded upon the truck and that later, when the load reached the Bayless log dump, Risley prematurely loosened two of them. He alleges that the purported premature loosening was negligence. His complaint, in stating the charges against Steeprow and Callahan,

segregates them into the following particulars: (1) "negligently placed the logs upon the defendant Risley's truck * * * in such insecure, unstable and faulty positions and in such a manner that said logs would not stay and remain upon said truck"; (2) "negligently failed to place and balance said logs upon said truck in such manner that they would remain thereupon safe and secure"; (3) "so negligently placed the said logs upon said truck that they were insecure, were out of balance and were in such position that the same would fall off after the binding chains placed around the same were removed."

Continuing its charges, the complaint avers that "the defendant Risley assisted in said log loading of said trucks by the said defendants Steeprow and Callahan and negligently permitted the said Callahan and Steeprow to load said logs when the same were not properly balanced and when the same were so placed that they were not secure upon said logging truck and in such manner that the same would fall off the said truck at and when the binding chains placed around the same were removed." The complaint also charges that Risley "negligently transported said logs thus negligently loaded and thus placed and remaining upon said truck in such unsafe position on to the dock of the Bayless Lumber Company." It avers that "when the plaintiff was stationed between the pond and the said logs and was engaged in scaling said logs * * * Risley negligently unloosened two binding chains which bound said logs upon said truck and caused and permitted one of said logs, because of the negligent loading thereof on the part of each and all of the defendants as herein alleged, to fall from said truck and upon the person and body of the plaintiff herein."

We shall now take note of the evidence which indi-

cates the manner in which the six logs were loaded upon Risley's truck at the scene of Steeprow and Callahan's operations. The plaintiff called the three defendants to the witness stand and had them describe, detail by detail, the method by which the truck was loaded. He does not claim that any one of the three gave untruthful testimony and does not seek to be relieved of anything which they said descriptive of the loading operations. Nor did he present any evidence in conflict with theirs. We shall now summarize their testimony.

Risley testified:

"I was the boss on the loading."

He amplified that statement by adding:

"How much to put on, and how to put it on, you might say. If I didn't like it, I would tell them so. * * *

"Q But you did tell them when to shift the load, how much to put on and how to place it?

"A That's right."

Defendants Steeprow and Callahan brought their logs by power equipment from the place where the timber was felled to an assembly place adjacent to their loading dock. Steeprow had charge of those operations. The loading dock includes a large log, termed a brow log, and skids consisting of smaller logs which are notched into it and extend toward the area where the logs that are ready for shipment lie. On the far side of the brow log is the road which is used by the trucks. A truck which is about to be loaded draws close to the brow log and stops there. The skids which we have mentioned are at the same level as the bunks of the truck. A caterpillar tractor, equipped with a blade

and operated by Callahan, rolls logs over the skids and over the brow log upon the truck.

Before the first log was rolled upon Risley's truck immediately before the ill-fated trip was made, the bunk blocks on the far side of the truck were shifted into the place which, it was assumed, was right for the accommodation of the first tier of logs. That having been done, Callahan's tractor rolled logs 1, 2 and 3 upon the bunks. When they were in place, the bunk blocks on the near side of the truck were drawn tight against the third log so that all three lay stationary and against each other. Then a steel skid was placed against the loaded logs and thereupon the tractor rolled and lifted the second tier of logs on top of the first. Finally, the steel skid was shifted again and the sixth log was rolled on top of the second tier.

The above is the manner in which the six logs were loaded upon the truck. The fourth log, being one of the two that formed the second tier, lay in the bed, or groove, where logs 1 and 2 came together. Log 5 lay in the bed where logs 2 and 3 came together. Log 6, which made the third tier, lay in the bed formed by logs 4 and 5. We quote the following from Callahan's testimony:

"Q Now, in the location of the logs on the bunks, did you observe anything, any failure on the part of any of those logs properly to saddle one on top of the other?

"A No, they were perfect, they were good.

"Q And so that there will be no misunderstanding, what do you mean by the word 'saddling the logs'?

"A Well, that's so as they sit in flush, and the shape of your log leaves a hole on there to spot between the two, the next log on top, the tier log above, have a perfect bed to lay in, and they all laid in their bed."

When all six logs had been loaded upon the truck, Risley examined the load to see if it was properly balanced. At the same time Callahan dismounted from his tractor and, in addition to surveying the loaded vehicle, climbed over the logs as he scaled them. While so engaged, he noticed that the bunk blocks were seven or eight inches from one side of the truck and about twelve inches from the other. He found that the two logs which comprised the second tier were properly "saddled" upon the first tier and that the top log lay in the bed formed by the second tier. He noticed that the six logs would not roll off the truck as it stood there, even in the absence of binder chains. While Callahan was examining the load and scaling the logs, Risley, with the help of another truck operator, bound the logs together by fastening, one by one, his three binder chains. He placed the chains around the logs in such a manner that the fastener device was upon the side of the truck which would be away from the log pond when he reached the latter. His purpose was to render it unnecessary for him to go to the side of the truck adjacent to the dump in order to release the chains.

We have mentioned the plaintiff's charge that the load was not properly balanced. Although much time was spent during the trial in making inquiries about balancing and how balance was achieved, only Risley was asked to state the purpose of balancing a load of logs. His explanation was the following:

"Now, you see, in the center of the bunks, there's none at all that actually touches the truck, that's what they call a dish. On my truck it's approximately 18 inches across, and there is a pin goes through this bunk, and fastens to the trailer. That's all that holds that to the trailer and out from the rest of the way that's open under there, clear, and

that's on both bunks, truck and trailer. If you should get your load heavy enough on one side that it touches and drags, you'd have lots of wrecks on the highway, you couldn't turn, and that's the primary purpose for that they call balance is to get that so that the load will rock on this dish.''

It seems clear that the purpose of balancing a load is to enable it to ride properly from the loading dock to its destination. According to Risley's testimony, it is infrequent that a load is found to be properly balanced after the logs have been placed upon the truck. Generally, it is necessary to shift the load slightly in order to obtain proper balance. The shifting is accomplished by having the tractor shove the logs upon the bunks until balance has been achieved.

After the logs in the instant case had been bound together by the chains, it was thought that the part of the load which rested upon the trailer was slightly off balance. Callahan had his tractor shove the part of the load which rested upon the trailer bunk "one link". By link, Callahan meant the length of one link of the binder chains—about three inches. Both Callahan and Risley believed that proper balance was achieved when the shift was made.

The above describes the method that was employed in loading the logs upon the truck, tightening the chains and putting the load into good balance.

We shall now summarize the evidence which describes the condition of the load immediately before Risley started for the Bayless pond. Callahan testified:

"That load was about one of the straightest as they come.

\* \* \*

"Q But were they straight?
"A They were.

"Q    Were there any irregularities in any of
them?
"A   No, sir.

"Q   In any of them?
"A   No, they were a pretty true lot of logs.

"Q   Well, when you say 'pretty true', you don't
mean they are absolutely straight?
"A   I have never seen a log yet that was.

"Q   Absolutely straight. Was there any of them
that was a more crooked condition than the others?
"A   No.

"Q   How about the top log?
"A   The top log was very straight because that
is the only thing we pick for peakers.

"Q   Peakers! You mean the top of it?
"A   That's the top of it.

"Q   Well, how about No. 3 and 4 logs. That's
the upper two above in the second row?"
"A   Were they straight?

"Q   Yes.
"A   They were."

Risley said that no log is "perfectly straight but that
the load with which this case is concerned was "way
better than average." He swore that all of the logs
as they lay upon the bunks of the truck were "properly
saddled", and added, "They were or I wouldn't have
hauled them. * * * I saw nothing wrong with them
whatsoever." He declared that when he put his truck
into operation his belief was confirmed that the load
was properly balanced. He explained, "If it hadn't
of been I would have stopped and had them shifted
again."

Steeprow's duties brought him only occasionally
to the loading dock and he did not examine the load
in issue.

The plaintiff, 52 years of age, had always "followed mechanical work and logging." According to him, he had "punched as yarder and loader and I have set chokers, chased rigging." He had had five years' experience in scaling logs and had worked for three months at the Bayless pond. When the plaintiff saw Risley's truck approach the log dump, he directed it to the exact spot where he wished it to stop. We now quote from his testimony:

"Q And you observed this load, did you not, at the time he pulled in?

"A Well, I just see that he had a load of logs. I didn't inspect them right at the time that he pulled in there.

"Q You looked at the load, didn't you?
"A I looked at it, glanced at it.

"Q Did you see anything wrong with the way the logs were loaded on the truck?
"A Well, I don't just remember that I did.

"Q You're unable to say that there was anything wrong that you observed with the way the logs were on the truck?
"A I never noticed it.

"Q And you did look at the load?
"A I looked at the load, glanced at it, yes.

"Q And you were experienced, as you say, in the matter of truck loads of logs?
"A That's right."

The above is a review of all of the evidence which describes the logs upon the truck, shows the manner in which they were loaded upon it and indicates the condition of the load after the three chains had been placed around the logs. It is also a review of the only evidence which indicates the appearance or condition of the load when it reached the Bayless millpond.

No witness testified that any irregularity occurred in any phase of the operations which we have reviewed, and no one mentioned any precaution or device in addition to those that were used that should have been employed.

As we have said, the load traveled 22 miles in order to reach the Bayless millpond where the plaintiff was stationed. According to the record, the truck, after leaving the loading dock, traveled a few hundred feet over a rocked private road and then upon a graveled county road to Alsea, where it remained for the night. The next morning the truck resumed its journey. From Alsea to Philomath the thoroughfare that was followed was the hard-surfaced public highway. But when the truck left Philomath it ran upon a road a mile or two in length before it reached the Bayless log dump, which was described by Risley in the following terms:

"A It had old planking on it there for a hundred yards or better, and this old planking had all been torn up, what I mean, by running over it and everything, and it was fairly rough, not too bad but it was rough. Then they had, oh, several hundred yards of good road, gravel, and then the last—oh, hundred yards, it had been either under construction or new, you know, just been building it, and they had this large, well, we call it crushed rock or shot stuff that had been dynamited or broken up somehow and mud and dirt and everything, just a base actually is what it was, very rough.

"Q As you're driving over that stretch of roadway, how fast would you drive?

"A Well, it was impossible to go any faster than your lowest gear would go. It was so soft and rough and everything you couldn't pull it.

"Q And when you were coming over that, would your load have a tendency to tip from side to side?

"A Oh, yes, yes, very much so."

Callahan, referring to the last 400 or 500 feet of that road, said that it "was full of chuckholes. * * * It was pretty bad. In fact, the trucks even got stuck there. They had to root them out with a cat."

Risley testified that, so far as he knew, his load of logs reached the log dump in the same condition as when it started.

When Risley's truck stopped at the place designated by the plaintiff, the latter, according to his testimony, received from Risley a "load slip", upon which Callahan had entered his scale of the load. Then he [the plaintiff] proceeded to scale the logs for his employer. He first worked on the side of the load away from the pond and then went to the other side, that is, the pond side. While working on the side away from the pond, he was assisted by Risley. After the plaintiff had secured data, he made entries upon scaling forms.

A part of the unloading or dump facilities of the Bayless Company was a large log, 40 feet in length, which lay parallel to and at the edge of the pond. Trucks like Risley's which came to unload logs stopped adjacent to that log, which was termed by the witnesses as the brow log. Two straps made of wire rope, which were fastened below the brow log at one of their ends, were the means by which the load of logs was lifted off the truck and then tipped into the water over the brow log after the other end of the straps had been attached to a cable which, in turn, was affixed to a motor's drum. As the log trucks approached the dump, the straps lay upon the road and the truck came to rest upon them. Presently the straps were pulled over the reach of the truck but under the logs, and still later they were attached to the cables which we have mentioned.

At the moment of his injury, the plaintiff was standing at the end of the brow log and was making entries upon his scale pad. He employed the brow log as a sort of desk. The following is taken from his testimony:

"Q Now, the place where you were standing, at the time you were writing the figures on these slips, you were then between the load of logs and the pond, were you not?

"A Between the load and the pond, that's right.

"Q And you were between the load of logs and the brow log or you wouldn't have been hit, were you?

"A I wasn't between the brow log and the load."

He also testified:

"Q Now, Mr. Snodgrass, did you go between the truck and the brow log?

"A No, sir.

"Q As a matter of fact, that's not the right place to go, isn't it?

"A That's right.

"Q That's known by people that know about scaling and dumping logs.

"A That's right."

While the plaintiff was standing in the position just indicated, the forward end of the top log of the load slid to the brow log and in so doing struck the plaintiff.

Before going on with the phase of the case mentioned in the preceding paragraph, we will return to Risley and the incidents that took place after he stopped his truck at the log dump. Risley, who was called to the witness stand by the plaintiff, testified that when he stopped his truck at the place designated by the plaintiff he dismounted and handed to the plaintiff the "load slip". Both men at that time were

on the side of the truck away from the pond. Then each went about his appointed task, and Risley, according to his testimony, paid no more attention to the plaintiff. In reviewing the plaintiff's testimony, we took note of what he did after Risley had handed to him the load slips. We shall now mention what Risley did after he had left the plaintiff.

Risley first removed the binder chain at the front of the load and placed it in a part of his truck which he termed "the box". The plaintiff conceded that he saw Risley loosen that chain. According to his testimony, Risley, after helping him scale on the road side of the truck, loosened the first chain. At that point the plaintiff walked to the pond side of the truck. We now quote from his testimony:

"* * * and I walked past Risley and he was taking the binder chain off, and I says to him 'I wouldn't do that' and I walked around the other side of the truck and took a look at the opposite log, the one that was next the brow log * * * and I laid the scale book on the end of the log, on the brow log.

* * *

"Q Well, do you remember that you saw him unfasten a binder chain?

"A That's right.

* * *

"Q Well, at any rate, it was after you saw him loosen the binder chain that you walked around to where you were writing your figures on the pad at the time you were hurt?

"A After I saw Risley, yes, that's right.

"Q You saw him loosen the binder chain, told him you wouldn't do that, and with that knowledge you walked around the front end of the truck so that your pad was on the brow log and you were writing on the pad?

"A Uh-huh.

"Q  Is that right?

"A  I believe that's right. I know after he loosened that chain, I walked around to the end of the truck, and I had the pad with me, and I laid it there on the brow log, and we measured this log, and I was just about to write this scale down.

\* \* \*

"Q  Now, the place where you were standing, at the time you were writing the figures on this slip, you were then between the load of logs and the pond, were you not?

"A  Between the load and the pond, that's right."

We now revert to Risley's testimony. He testified that after he had placed the first binder chain in the box, he went under his load and pulled the two unloading straps over the truck's reach so that they could be fastened later to the unloading cables. That having been done, he removed the second binder chain and put it in the box. He swore that while he was performing those acts he did not watch the plaintiff and that it had not occurred to him that the plaintiff would go to the pond side of the truck. After Risley had put the second binder chain in the box, he headed for the rear of his load for the purpose of removing the third binder chain, but "on the way back I noticed—that would be the south or back unloading strap as it came through across the reach was underneath my reach tightener and I crawled under" for the purpose of adjusting the strap. At that point he heard "a rustling sound \* \* \* and then a thump." When he crawled out from under the truck he observed that the forward end of the top log had slid and in its new position rested upon the brow log. He also noticed that the third binder chain had broken. The errant

log, in making its movement, inflicted the injury for which the plaintiff sought redress when he filed this action.

No one claims that Steeprow and Callahan participated in any way in the removal of the chains. Neither of those defendants nor any of their employees were present at the log dump. Likewise Steeprow and Callahan were not in any degree responsible for the chains.

The plaintiff testified that usually "the other binder chains" were not released until he had (1) finished the scaling; (2) run the unloading straps over the reach; and (3) connected the straps with the cables that ran over the motor's drum. Thus he claims that Risley released the binder chains prematurely.

No evidence was presented indicating that logs should be so placed upon log trucks that they will remain in place and will not roll off when the binder chains are released.

The above, we believe, is a fair review of the evidence which indicates whether any party to this case was guilty of negligence.

The first assignment of error, being the one now under consideration, is based upon a contention that error was committed when the court sustained the motion of Steeprow and Callahan for an order of involuntary nonsuit. In arguing in behalf of that assignment of error, the plaintiff urges that the work in which Steeprow and Callahan were engaged involved risk and danger within the purview of the "and generally" clause of § 102-1601, OCLA, and that the plaintiff was "within the reach of the dangers and risks of such work." His brief, after arguing

that Steeprow and Callahan negligently loaded the truck, says:

"It is the claim of the plaintiff that this negligence required submitting the case to the jury under the Employers' Liability Act as well as under the common law."

In our disposition of that assignment of error, we will assume, but not decide, that the plaintiff was "within the reach of the dangers and risks" of the work in which Steeprow and Callahan were engaged, and that it was the duty of that firm to have complied with the demands of the "and generally" clause as well as those of the common-law rule of due care.

Assuming, as we have just done, that the evidence may have warranted a finding that the operations of Steeprow and Callahan were within the "and generally" clause of § 102-1601, OCLA, and that the duties which that clause imposed were in part for the plaintiff's protection, then, if the finding was authorized and made, Steeprow and Callahan should have used "every device, care and precaution which it" was "practicable to use for the protection and safety of life and limb, limited only * * *." If the evidence did not disclose a situation encompassed by the "and generally" clause, the rule of due care governed the plaintiff's charge of negligence.

■ It is, of course, manifest that, regardless of whether the operations of Steeprow and Callahan were governed by the Employers' Liability Act or the standard of due care, the burden of proof rested upon the plaintiff to present evidence attributing negligence to Steeprow and Callahan.

The plaintiff's brief, referring to the log which partially fell off the truck, says:

"Had the log been properly placed in the saddle and had it not been twisted or bound by the subsequent action of the bulldozer after all the logs were bound together by the chains in the loading operations by Steeprow and Callahan, there would have been no cause for the log to fall."

That is the closest approach which the plaintiff makes to placing a finger upon a possible cause for the mishap. The brief employs the term "bulldozer" where we, following the practice of the witnesses, used the words "tractor" and "caterpillar tractor". It will be observed that the excerpt which we quoted from the plaintiff's brief suggests that the top log, being the one which slid when two of the binder chains had been removed, was not placed properly "in the saddle" during the course of the loading operations. Our examination of the record has revealed the unchallenged and uncontradicted evidence, reviewed in preceding paragraphs, showing that the log in question was properly saddled by Callahan. The testimony which so shows is couched in unambiguous terms and affords no opportunity for an interpretation favorable to the plaintiff. The quoted excerpt also says that the top log was "twisted or bound" by the tractor when it shifted the load while bringing it into balance. By reverting to our review of the evidence, it will be noticed that it contains no intimation that any log was "bound" by anything except the binder chains. Steeprow and Callahan had not placed the chains upon the load and were not responsible for them. Both Risley and Callahan, it will be remembered, examined the load before it started upon its way and both testified that they saw nothing irregular about the load. The plaintiff observed the load as it took its position at

the log dump and nothing unwonted came to his attention. He had a good opportunity to survey the load a few moments later when he proceeded to scale the logs. In the course of scaling them, he not only measured the logs but also examined them for rot and other defects. Thus, he paid close attention to the load. As a witness, he made no intimation that any of the logs appeared to be twisted, bound or improperly placed in position. It is clear that no witness' direct testimony affords any basis for believing that any log was twisted or improperly bound.

After the three defendants, as witnesses called by the plaintiff, had described in detail the manner in which Risley's truck was loaded, the plaintiff did not mention any device which they should have used in addition to those which were actually employed. Likewise, he offered no direct evidence suggesting any care or precaution which should have been exercised but which was omitted. Nor did he criticize anything which any of the three had done in loading the truck. Thus, so far as the direct evidence indicated, the three defendants, who are the respondents in this case, used every device, care and precaution within the ken of men to render the load safe.

■ The plaintiff's brief contains this additional passage:

> "Can it be said, as a matter of law, that the logs were not negligently loaded when immediately when two of the chains are removed one of the logs falls off?"

The plaintiff contends that the doctrine of res ipsa loquitur is applicable and cites *Gillilan v. Portland Crematorium Association*, 120 Or 286, 249 P 627. That decision dwelled upon the fact that res ipsa loquitur

is applicable only when the alleged tort feasor was in possession of the injury-inflicting instrument. The Gillilan decision pointed out that the purported negligent instrumentality with which it was concerned "was under the exclusive control of defendant." Two recent opinions by this court, which reiterated that the defendant must be in possession of the harm-inflicting agency to warrant resort to res ipsa loquitur, are *Gow v. Multnomah Hotel,* 191 Or 45, 224 P2d 552, 228 P2d 791, and *Dunning v. Northwestern Electric Co.,* 186 Or 379, 199 P2d 648, 206 P2d 1177.

■ In the case at bar, the load of logs was not in the possession of Steeprow and Callahan at the time when the errant log slipped and inflicted injury. The mishap occurred 22 miles from the scene of Steeprow and Callahan's operations. The load had left their premises at about 5:00 p. m. the day before the accident and did not reach the Bayless log dump until the next morning. It had remained overnight upon the public streets of Alsea and before arriving at the log dump had traveled upon some very rough road. The logs and the truck upon which they reposed had been in the exclusive possession of Risley since the loading operations began. Risley's unchallenged evidence shows that he "was the boss on the loading" and, of course, he alone operated the truck. Neither member of the firm of Steeprow and Callahan, nor any employee of that firm worked at the Bayless log dump. We are satisfied that the rule of res ipsa loquitur cannot be employed in this case.

Risley, Callahan and Steeprow, whose testimony constitutes a large part of the subject matter of the foregoing review, were the defendants and, therefore, presumably adverse to the plaintiff's case. Oregon

Laws, 1937, Ch. 23, § 1, amended § 4-709, OCLA, by incorporating into it this provision:

"When a party calls as a witness either an adverse party or * * * he shall not be deemed to have vouched for the credit of such witness and he may impeach the credit of such witness in the same manner as in the case of a witness produced by an adverse party."

The plaintiff, however, did not impeach in any manner the credit of those three witnesses. Nor did he present any evidence which made the facts given by the three appear to be improbable, unnatural or difficult of acceptance.

Section 2-202, OCLA, says:

"The direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact except usage, perjury and treason."

■ But, if the testimony given by the three defendant-respondents is totally disbelieved, the resulting situation will not warrant a reversal of the circuit court's order, which sustained the motion of Steeprow and Callahan for an involuntary nonsuit. The burden of proof upon the plaintiff's charge that Steeprow and Callahan negligently loaded Risley's truck was upon the plaintiff. The foregoing review of the evidence given by the plaintiff and his witnesses contains nothing which supports his charge of negligence. Neither the plaintiff nor any of his witnesses attributed to Steeprow and Callahan any act of nonfeasance or misfeasance.

Before reaching a final conclusion, we will take notice of *Pacific States Lumber Co. v. Bargar,* 10 F2d 335, and *Rorvik v. North Pacific Lumber Co.,* 99 Or 58, 190 P 331, 195 P 163, which the plaintiff seems to

believe indicate that Steeprow and Callahan were negligent.

In the Pacific States Lumber Company case, the plaintiff was injured when a load of lumber upon a car became unstable and fell upon him. He claimed that the defendant "should have put stanchions on the side of the car to have held the lumber in place; that laths should have been placed crosswise between the tiers of lumber; and that chains, or ropes, should have been placed about the lumber." Concerning those charges, the decision said: "There was a controversy as to whether any of those methods of handling the lumber were practicable, but there was some evidence to support plaintiff's contention." In other words, in that case, unlike this one, the plaintiff presented evidence of negligence.

In the Rorvik case, it was virtually conceded that the record established a tort. The chief issue was whether it indicated that the deceased's death resulted from "a maritime tort" or "a land tort".

We believe that no error was committed when the motion of Steeprow and Callahan for an involuntary nonsuit was sustained. The first assignment of error lacks merit.

Assignment of error No. 2 is phrased by the plaintiff as follows:

"Under Exception No. 2, exception was taken by the plaintiff to the giving of the instructions by the court found on pages 3, 4 and 5 of the Bill of Exceptions. The instructions are long upon this subject and we will take an example found on page 5 of the Bill of Exceptions:

"'You are further instructed that such contributory negligence, if any, on the part of the plaintiff will completely bar or prevent a verdict for plaintiff if such negligence on plaintiff's part

proximately contributed to the happening of said accident, no matter how slightly, even though the defendant was also negligent.' ''

The essence of the plaintiff's contention concerning that assignment of error is expressed by his brief in these words:

"The above exceptions bring into this case the question as to whether the defendant, Risley, who owned and operated his own truck and was not an employer of any employee is liable under the Employers' Liability Act to the employee of another. It is the position of the plaintiff that the Employers' Liability Act designates the person liable as 'all owners, contractors or subcontractors and other persons having charge of, or responsible for any work involving a risk or danger to the employees', etc.

"It is submitted that Risley was a contractor and * * *.''

It will be observed that the second assignment of error concerns Risley only.

The plaintiff-appellant's case against the defendant-respondent Risley, it will be recalled, was submitted to the jury and it returned a verdict in his favor. Risley was not an employer. The instructions portrayed the common-law rule of due care but said nothing concerning the Employers' Liability Act. The latter does not deem contributory negligence a defense.

■■ We believe that the plaintiff's contention that error was committed when the circuit court held that the Employers' Liability Act did not embrace the work in which Risley was engaged is foreclosed by *Gray v. Hammond Lumber Co.*, 113 Or 570, 232 P 637, 233 P 561, 234 P 261, in which this court, after bestowing careful attention upon the issue, held that the Employers' Liability Act is applicable only to employers.

We do not deem the issue open for reanalysis. We hold that the second assignment of error is without merit.

The third assignment of error reads as follows:

"The person liable under the Employers' Liability Act, Section 102-1601, OCLA, are 'all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees.'"

That assignment of error is controlled by the conclusion which we reached in regard to assignment of error No. 2. We hold that it is without merit.

The above disposes of all contentions advanced by the plaintiff-appellant. The judgment of the circuit court is affirmed.